Stella I. WALKER, Appellant (Plaintiff Below),

v.

STATE of Indiana, MUSCATATUCK STATE DEVELOPMENT CENTER, Appellee (Defendant Below).

No. 93S02–9804–EX–216.

Supreme Court of Indiana.

April 17, 1998.

C. Richard Marshall, Shari E. Kinnaird, Columbus, for Appellant.

Jeffrey A. Modisett, Attorney General, Priscilla J. Fossum, Deputy Attorney General, Indianapolis, for Appellee.

## ON PETITION TO TRANSFER

SELBY, Justice.

Stella I. Walker, plaintiff and appellant below ("plaintiff"), challenges the decision of the Worker's Compensation Board ("Board") which denied her application for total permanent disability payments.[1] The critical question before this Court is whether the seamstress position at the Muscatatuck State Development Center ("Center"), which the State offered to plaintiff under its partial disability program, constitutes "reasonable employment," thereby defeating her claim for total permanent disability. Both the Board and the Court of Appeals conclud-

ed that the position offered plaintiff under the State's disability program did constitute reasonable employment. We disagree. We conclude that such employment, as a matter of law, cannot constitute "reasonable employment" so as to defeat plaintiff's claim for total permanent disability payments because the offered position was only temporary and was so highly accommodated[2] to plaintiff's disability that, once the position would end, it would be extremely difficult if not impossible for her to find suitable employment in the general competitive labor market. We, therefore, reverse the decision below and remand for further proceedings not inconsistent with this opinion.

## FACTS AND PROCEEDINGS BELOW

Plaintiff worked in the laundry facilities of the Muscatatuck State Development Center from 1988 to 1991. She is approaching sixty years of age, has only an eighth grade education, and reads at the level of a sixth or seventh grader. The parties stipulated that she was injured in an accident arising out of and during the course of her employment[3] with the Center on September 3, 1991. As she and another employee pulled apart large laundry baskets which were stuck together, she felt her lower back pop and experienced significant pain. Then, in December 1991, Dr. Thomas Marshall, a state-provided orthopedic surgeon, diagnosed her as having degenerative disk disease with a L5/S1 grade II spondylolisthesis, that is, the fifth lumbar vertebra had slipped forward and displaced more than 25% in relationship to the S1 vertebra. After conservative treatment was unsuccessful, Dr. Marshall performed spinal fusion surgery to fuse her L4, L5, and S1 vertebrae.

During 1991 through June 26, 1993, the State paid plaintiff medical benefits[4] and

---

1. *See* Ind.Code §§ 22–3–3–8, 22–3–3–10(c), 22–3–3–22 (1993 & Supp.1997).

2. An "accommodated" position in the context of Indiana's worker's compensation scheme is one that has been modified to suit the needs of an injured or disabled employee. "Accommodations" may include job restructuring, for example, by modifying certain nonessential job functions or responsibilities, required hours of work, or location of work stations. Accommodations

also may include the acquisition or modification of equipment, devices, or facilities, the provision of qualified readers or interpreters, and other similar adjustments to facilitate a disabled employee's return to work.

3. *See* Ind.Code § 22–3–2–2(a) (1993).

4. *See* Ind.Code § 22–3–3–4 (1993 & Supp.1997).

weekly temporary total disability benefits under its worker's compensation program. Her average pre-injury weekly salary was $235.50, and her weekly disability rate was $157.01.[5] The State paid plaintiff a total of $13,222.49 in temporary total disability benefits over the course of approximately eighty-four weeks. On June 26, 1993, however, the State ceased all worker's compensation benefits.[6]

Plaintiff filed an Application for Adjustment of Claim with the Board and an amended Application on February 12, 1993 and September 3, 1993 respectively. By a letter dated November 14, 1994, more than three years after her injury and more than a year after plaintiff filed her amended Application, the State offered plaintiff a temporary, full-time position as a seamstress under the State's partial disability program,[7] subject to plaintiff's and Dr. Marshall's approval. The position was temporary and would exist only until plaintiff "is released to work without restriction, or is released with restrictions in the third year of long term disability, or exhausts· benefits under the plan" after approximately four years. (R. at 324). Plaintiff, after consulting with Dr. Marshall, declined to accept this position.

At the hearing on April 26, 1995, plaintiff presented Dr. Marshall who testified that plaintiff was disabled and unlikely to be able to return to her former employment at the Center's laundry facility due to her physical limitations. He reported that she cannot perform work which requires repetitive bending or twisting and cannot do overhead work; that she is limited to lifting or carrying five to ten pounds occasionally but cannot perform either one of these activities for any duration; and that it is unlikely that she can perform either one of these activities for one hour per day.[8]

Regarding the possibility of sedentary work, Dr. Marshall reported that "it is unlikely that Stella Walker could maintain a sitting posture for two hours at one stretch," and that "[s]he probably would be able to sit for one hour, but then would have to get up and move about." (R. at 239–40.) He testified that it is unlikely that she could perform a job that would involve stooping or bending forward at the waist, given that she had only thirty degrees of forward flexion instead of seventy-five to ninety degrees. He specifically advised plaintiff that she could not perform the seamstress position offered to her by letter dated November 14, 1994. He made it clear that he regarded her condition as having stabilized and her limitations as being permanent. Specifically, he noted that "[s]he is unfit for any employment because she can't do anything which requires her to do prolonged standing, sitting or any repetitive bending or twisting," (R. at 290) and that she is "[u]nfit to return to employment permanently" (R. at 291). He evaluated her loss at 25% whole body impairment.

Plaintiff also presented the testimony of Archie Sanders, a vocational expert and certified. rehabilitation counselor who interviewed and evaluated plaintiff to determine

5. *See* Ind.Code §§ 22-3-3-8, 22-3-3-10(c), and § 22-3-3-22.

6. Plaintiff continued to receive federal social security disability benefits, *see* 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A) (1994), in the amount of approximately $313 per month, and long term disability benefits from the State's employee fringe benefits package.

7. The State's partial disability program was established pursuant to Ind.Code § 5-10-8-7 (1993 & Supp.1997), the statute authorizing the establishment of short and long term disability plans, and is described only very generally in Ind.Admin.Code tit. 31, 3-1-27 (1996). According to the testimony of state witnesses, the program was established in 1989 but did not begin operating until November 1993. The purpose of the program is to serve as "a bridge to a new career, to a new job, a bridge back to work, a test period for finding out what a person can do," (R. at 379) or, stated another way, it is a kind of vocational rehabilitation program. The program places disabled persons who are unable to return to their previous positions in modified duty jobs. The program is very flexible. Some of the participants fit neatly into an already described job, while others work in jobs created especially for them.

8. Although at one point, Dr. Marshall stated that plaintiff would be limited to lifting 25 pounds, he later clarified that he would restrict her to lifting not more than 10 pounds in light of the fact that, even after surgery, she has done so poorly and has had increasing difficulty with pain and with functioning.

her employability. She told him that she had trouble urinating, dressing herself, making the bed, and running a vacuum cleaner. She stated that she could not stand for more than ten minutes without experiencing pain in her back and right leg, and could not sit for more than several minutes. She could not stoop, bend, or squat, and had difficulty climbing steps and lifting a gallon of milk weighing between eight and nine pounds. She also had experienced a depression that had improved since she went on medication.

In addition to interviewing plaintiff, Sanders reviewed her medical records to assist him in evaluating her exertional limitations and also considered nonexertional factors that could affect her employability, including her age, education level, mental status, intelligence, and prior training and work experience. Regarding her exertional limitations, Sanders noted that, although she has range of motion limitations due to her back problem, she also has a significant pain problem that is associated with her back and that limits her ability to function. According to Sanders, individuals experiencing such pain often have difficulties concentrating and persevering with a task, and this, in turn, translates into problems with production and employability.

Regarding her nonexertional limitations, Sanders noted that she was born on April 17, 1938, that is, she was fifty-seven years old at the time of the hearing; that some work attributes related to ability to physically exert oneself as well as to eye/hand coordination and to manual and finger dexterity, often decline as a person ages; and that, in addition, it is more difficult to find work when you are older. With regard to her education, she did not receive any schooling beyond the eighth grade, did not receive her GED, and did not receive any vocational training. Her previous positions all involved manual labor.[9]

Sanders concluded: "Mrs. Walker obviously has too many pain limitations to be able to perform any kind of work, even at a sedentary level, that I would know of in the economy. In my opinion, there's [sic] no reasonable kinds of jobs that a person with her limitations could do." (R. at 57.) He stated that she has no transferrable skills outside of her previous work, and that, in light of her exertional and nonexertional limitations, there are no categories of employment that she could do on a full-time or half-time basis, and there is no kind of job in the economy that he would recommend that she try. He opined that she could not perform as a seamstress on a full-time basis and could not perform that job four hours per day three days per week.

Plaintiff testified as to the pain she experiences when sitting or standing and explained that during the course of the day she needs to lie down five or six times for approximately forty-five minutes to an hour. She testified her legs and hands sometimes tingle or get numb, and that she has difficulty thinking because of the pain, but also has difficulty functioning when she takes the medication to relieve the pain. She also testified that she loved working, and that, but for the pain, would like to continue to work, but that she knows that she cannot work and particularly that she cannot work every day. She was familiar with the position of seamstress, because she did sewing while working at the laundry, and stated that the job required her to bend forward. She did not think that she could perform the job of seamstress.

In response to plaintiff's evidence, the State presented a report by Dr. Lorber, a medical doctor who examined her once and opined that her fusion surgery was not successful in stabilizing her vertebrae, and that her prognosis was poor. He stated that it is unlikely that she could resume work in the laundry, and he concluded that she has a

9. While at the Center, she initially worked as a psychiatric attendant and, in this capacity, she would feed, bathe, dress, and care for a patient's personal needs. She would occasionally lift or restrain patients and her lifting requirements could be in the 100 pound range. While working in the laundry room she did a lot of bending, stooping, and squatting as she loaded, unloaded,

sorted, and folded clothes, and this job required lifting up to 50 pounds. Prior to working at the Center, for approximately 20 years she worked for Oxford Industries, a plastic molding corporation that closed in 1989. She inspected parts and in the course of her work would lift and carry as much as 50 pounds of parts.

permanent partial impairment of 20%. The State also presented a functional capacity evaluation prepared by Roger Stephens, an occupational therapist. As a result of his examination and interview, he concluded that she has a legitimate back problem with a "possible psychological overlay influencing Ms. Walker's perception of her functional impairment." (R. at 276.) He stated that, although she is not totally functionally impaired and could perform sedentary work, "locating gainful employment within the limitations she demonstrated during this evaluation would be very difficult." (R. at 275–76.) He recommended that she seek counseling in chronic pain management to improve her perception of function and therefore her employability and also suggested that she apply to the Office of Vocational Rehabilitation to assist her in locating employment within her functional limitations. Id.[10]

Ralph Hunter, the State's personnel officer for the Center, testified that they would tailor the seamstress position previously offered to plaintiff as a full-time position, to suit her disability. In light of the testimony and evidence, Hunter testified that she could work four hours per day three days per week rather than full-time or even half-time. He stated they would accommodate her need to stand and sit only for short periods of time and would provide a couch or cot so that she could lie down as needed. He stated that there would be no production standard for her, and that she could take off extra time for medical appointments. He confirmed that this position was being offered pursuant to the State's partial disability program and was temporary.

Finally, the State's vocational expert, Thomas Roundtree, who interviewed plaintiff and reviewed her medical records, reported and testified that the State's offered seamstress position would be consistent with the restrictions emanating from her work-related impairments. He agreed that it was a position highly accommodated to plaintiff's needs, and explained, in fact, that he had concluded that she could perform the job based on the State's representation that it would tailor the position to accommodate her special needs. He did not disagree with Sanders' conclusions that plaintiff had difficulty sitting and standing, or that it may be difficult for her to find employment in the local labor market.

On September 7, 1995, the hearing judge prepared findings that stated, among other things, that Dr. Marshall gave work restrictions of no repetitive bending, twisting, no overhead work, and limited plaintiff to twenty-five pounds of lifting;[11] that the functional capacity test indicated that plaintiff could do sedentary work with occasional lifting of ten pounds and could occasionally sit, stand, bend, and reach; that Roundtree concluded that plaintiff could perform the job offered to her; that plaintiff testified that she would like to return to work;[12] that the State offered plaintiff a job in which all of her restrictions will be honored, including allowing a change in position every ten minutes; that Dr. Marshall issued a 25% permanent partial impairment rating; and that plaintiff has been paid, pursuant to stipulation, $10,-000 for a lesser permanent partial impairment rating based upon Dr. Lorber's report.

The hearing judge then concluded that plaintiff's level of impairment is 25%; that the State is obligated to pay or reimburse

10. Sanders, on the other hand, testified that the Vocational Rehabilitation employees would not be in a position to help her and would determine that rehabilitation was not feasible, and, in fact, according to plaintiff, when she applied to the Vocational Rehabilitation program, they simply interviewed her and then told her that they did not think the program would help her.

11. Because Dr. Marshall revised his lifting limitation to 10 pounds (see supra note 8), this recitation of the evidence is not accurate. See Perez v. United States Steel Corp., 426 N.E.2d 29, 32–33 (Ind.1981) (findings should do more than simply restate the testimony or other evidence and

should be clear enough and detailed enough to permit appellate review); Whispering Pines Home for Senior Citizens v. Nicalek, 333 N.E.2d 324, 326 (Ind.Ct.App.1975) (same). To the extent that it may be characterized as a finding, it is not supported by substantial evidence.

12. As a recitation of the evidence, this is inaccurate, as plaintiff's testimony fairly characterized, was that she had enjoyed working and that "but for the pain" she would love to work, but did not believe that she could perform the offered job. (R. at 345–47.) To the extent that the above statement can be characterized as a finding, it is not supported by substantial evidence.

plaintiff for all statutory medical expenses up to and including May 27, 1993, the date upon which the hearing judge found she had reached maximum medical improvement; that, although plaintiff has limiting work restrictions due to her injury, these restrictions do not make her unable to resume reasonable types of employment such as those which were offered by the State and which are within her work restrictions; [13] and that plaintiff is not totally and permanently disabled. The judge then ordered the State to pay an additional $2,500 to plaintiff to compensate her for the full 25% impairment, and that the State pay plaintiff for all medical expenses incurred up to and including May 27, 1993.

On January 19, 1996, the Board adopted and affirmed the hearing judge's decision with one member dissenting. The Court of Appeals affirmed the Board's decision in an unpublished memorandum opinion on September 16, 1996.

## DISCUSSION

Plaintiff argues that she has met her burden of establishing that, in light of her work-related impairment and other factors, there is no "reasonable employment" that she could regularly and continuously pursue, and that therefore she is totally and permanently disabled. The State responds that the job which the Center offered her as a seamstress constitutes reasonable employment as a matter of law. The critical question before this Court, then, is whether the temporary and highly accommodated position as a seamstress at the Center, which the State offered

to plaintiff under its partial disability program, constitutes "reasonable employment," thereby defeating her claim for total permanent disability.[14]

After first reviewing the burden of proof and standard of review applicable in worker's compensation cases, we then analyze the concept of "reasonable employment" in the context of this case and explain why, contrary to the conclusions of the Board and the Court of Appeals, the employment offered plaintiff, as a matter of law, cannot constitute "reasonable employment" so as to defeat her claim for total permanent disability benefits.

### I. Burden of Proof and Standard of Review

In a worker's compensation case, the claimant who seeks total permanent disability benefits bears the burden of persuasion. To carry her burden, an injured claimant generally must establish her "disability," and the total and permanent (as opposed to partial and temporary) nature of that disability. See K-Mart Corp. v. Morrison, 609 N.E.2d 17, 29 (Ind.Ct.App.1993). The term "impairment"[15] refers to the injured employee's loss of physical function(s); whereas the term "disability" refers to the injured employee's inability to work. See Hill v. Worldmark Corp., 651 N.E.2d 785, 786 n. 1 (Ind. 1995); Talas v. Correct Piping Co., 435 N.E.2d 22, 26 (Ind.1982). To establish a "permanent total disability," it is not necessary that the claimant prove her impairment or loss of bodily function is, or approaches, 100%, because an injured worker may experience a partial impairment and at the same

13. Notwithstanding the hearing judge's references to "types" of employment offered by the State, as we read the record, the State only offered plaintiff one position and that was the position of seamstress. While, in a report, Roundtree made a passing reference to the State's willingness also to consider placing her in a clerical position, nothing in the record supports the conclusion that any position other than seamstress was offered to plaintiff.

14. With regard to plaintiff's prayer that we grant her an award of 25% impairment, our reading of the record is that the parties stipulated that, in addition to the $10,000 which the State originally paid to plaintiff, she could pursue her claim for total permanent disability as well as an additional award for her impairment. The hearing

judge then found that she suffered a 25% impairment and awarded her an additional $2,500, and the hearing judge's decision was affirmed by the Board and the Court of Appeals in its entirety. Neither plaintiff nor the State has contested the amount of the additional award or has seriously pressed for review on any issue related to the impairment determination and award. We, therefore, summarily affirm the additional award. See Kimberlin v. DeLong, 637 N.E.2d 121, 123 n. 1 (Ind.1994) (interpreting Ind.Appellate Rule 11(B)(3) and reasoning that "summarily affirmed" indicates "that we are declining to review certain issues, in essence a partial denial of transfer").

15. Ind.Code §§ 22-3-3-4, 22-3-3-10 (1993).

time be unable to engage in reasonable forms of work activities. *Talas*, 435 N.E.2d at 27; *Rockwell Int'l v. Byrd*, 498 N.E.2d 1033, 1039 (Ind.Ct.App.1986). Rather, the injured worker must simply establish that she cannot obtain or perform "reasonable" types of employment. *Perez v. United States Steel Corp.*, 428 N.E.2d 212, 215–16 (Ind.1981) (on petition to transfer after second remand); *Perez v. United States Steel Corp.*, 426 N.E.2d 29, 31 (Ind.1981) (on petition to transfer after first remand).

■ In determining whether a claimant is entitled to "total permanent disability" and whether the claimant can obtain and perform "reasonable" types of employment, this Court has employed the definitions set out by Ben F. Small in his treatise *Workmen's Compensation Law of Indiana* (1950 & Supp. 1976). Professor Small has emphasized that, while a "total disability to be permanent must be one which so destroys or shatters a workman's wage earning capacities as to leave him unable to resume reasonable types of employment for the remainder of his life," it is not necessary for a claimant to prove "an utter inability to do anything with the remains of his body" for the "believe-it-or-nots

demonstrate that even the most hopeless human wrecks have on occasion developed obscure means for obtaining livelihood." *Id.* § 9.4, at 244, *cited in Perez v. United States Steel Corp.*, 172 Ind.App. 242, 245–46, 359 N.E.2d 925, 927–28 (1977).[16] Rather, it is sufficient that the worker show that he cannot carry on reasonable types of employment, with the "reasonableness" of the worker's opportunities to be "measured by his physical and mental fitness for them and by their availability." *Id.*; *Perez*, 428 N.E.2d at 215–16; *Perez*, 426 N.E.2d at 31. *See also Rockwell Int'l v. Byrd*, 498 N.E.2d at 1039.

■ Once plaintiff has established the degree of obvious physical impairment, coupled with other facts such as the claimant's capacity, education, training, or age, and has established that she has attempted unsuccessfully to find work or that it would be futile to search for work in light of her impairment and other characteristics,[17] the burden of producing evidence that reasonable employment is regularly and continuously available then rests on the employer.[18] *See generally* 4 Arthur Larson, *Larson's Workers' Compensation Law* § 57.51, at 10–283 to –378, § 57.61(c), at 10–405 to –439 (1997) (discuss-

16. *Accord* 4 Arthur Larson, *Larson's Workers' Compensation Law* § 57.51(a), at 10–283 to –286 (1997) (stating that "total disability" in compensation law is "not to be interpreted literally as utter and abject helplessness"; evidence that claimant has been able to earn occasional wages or perform certain kinds of gainful work neither rules out a finding of total disability nor requires that it be reduced to partial). *See also Lee v. Minneapolis St. Ry.*, 230 Minn. 315, 41 N.W.2d 433, 436 (1950) (reasoning that an employee "who is so injured that he can perform no services other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist," may be classified as totally disabled).

17. *See, e.g., Peoples v. Cone Mills Corp.*, 316 N.C. 426, 342 S.E.2d 798, 806–09 (1986) (affirming award of total disability benefits where evidence established that plaintiff was uneducated and 57 years old and where the testimony established that it was unlikely that a position similar to the highly modified position offered plaintiff after his injury exists in the market; held that an employee need not establish that he sought employment where such an effort would be futile because of age, inexperience, lack of education or other preexisting factors); *Leeper v. Department of Labor and Industries*, 123 Wash.2d 803, 872 P.2d 507, 514 (1994) (a claimant need only prove that he

or she is incapable of performing light or sedentary work of a general nature); *Anaya v. Holly Sugar Corp.*, 928 P.2d 473, 475–76 (Wyo.1996) (claimant was required to show he had made reasonable efforts to find work after reaching maximum medical improvement or, alternatively, that he was so completely disabled by his work-related injury that any effort to find employment would have been futile).

18. *See, e.g., Ceco Corp. v. Indus. Comm'n*, 95 Ill.2d 278, 69 Ill.Dec. 407, 408–11, 447 N.E.2d 842, 843–46 (1983) (claimant met his burden by establishing that he had hurt his lower back and suffered from persistent pain, and that he was an uneducated, Spanish speaking laborer; respondent did not prove that suitable employment was reasonably available; finding of total permanent disability affirmed); *Hill v. L.J. Earnest, Inc.*, 568 So.2d 146, 148–54 (La.Ct.App.1990) (claimant met his burden by establishing that he injured his back, was unable to work free of pain, was uneducated and had no specialized training; the only evidence of job availability produced by defendant was a light duty position that likely would have caused him significant pain; reversing and holding that claimant was totally and permanently disabled).

ing the "odd-lot" category of employees) [hereinafter Larson]. *See Rockwell Int'l v. Byrd,* 498 N.E.2d at 1039–40, *cited in* Larson, § 57.51(c), at 10–341 (affirming award of total permanent disability where partially impaired, uneducated, and unskilled claimant must lie down at regular intervals to obtain relief from pain after a back injury and therefore was unable to carry on reasonable types of employment, as measured by his physical and mental fitness for available job opportunities). Shifting the burden of production to the employer under these circumstances is justified because it is much easier for the employer, by virtue of its contact with the labor market, to prove the claimant's employability than it is for the employee to attempt to prove the universal negative of being totally unemployable. *E.R. Moore Co. v. Indus. Comm'n,* 71 Ill.2d 353, 17 Ill.Dec. 207, 211, 376 N.E.2d 206, 210 (1978).

■ On appeal, we review the decision of the Board, not to re-weigh the evidence or judge the credibility of witnesses, but only to determine whether substantial evidence, together with any reasonable inferences that flow from such evidence, support the Board's findings and conclusions. *Perez,* 428 N.E.2d at 216, *cited in Hill v. Worldmark Corp.,* 651 N.E.2d at 786. Where the question before this Court, however, is primarily a legal question, we do not grant the same degree of deference to the Board's decision, for law is the province of the judiciary and our constitutional system empowers the courts to draw legal conclusions. *See Board of Trustees of the Public Employees' Retirement Fund v. Miller,* 519 N.E.2d 732, 733 (Ind.1988). Moreover, in performing a legal analysis and in interpreting the provisions of the Worker's Compensation Act,[19] we construe the Act and resolve doubts in the application of terms in favor of the employee so as to effectuate the Act's humanitarian purpose to provide injured workers with an expeditious and adequate remedy. *See Talas,* 435 N.E.2d at 28; *Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 251, 297 N.E.2d 425, 427 (1973);

*Kancs v. Walker,* 557 N.E.2d 670, 672 (Ind. Ct.App.1990).

## II. *Reasonable Employment Analysis*

■ While what constitutes reasonable employment is often a question of fact, at the outer perimeters, the question is one of law. *Board of Trustees of the Public Employees' Retirement Fund v. Miller,* 519 N.E.2d at 733. In this case, there is no serious factual dispute.[20] The parties stipulated to the fact that, on September 3, 1991, plaintiff injured her lower back in an accident arising out of and in the course of her employment at the Center. Moreover, there is no dispute in the record on the following points: that she underwent surgery and suffered a significant permanent partial impairment of her back as a result; that she is unable to return to work in her previous position; that she is unable to do manual labor that requires lifting more than ten pounds; that her previous positions have all involved manual labor; that she is uneducated; that, because of her chronic pain, she cannot sit or stand for significant periods of time and must lie down off and on throughout the day to relieve the pain; that she is capable of neither full-time nor half-time work; that the seamstress position offered to plaintiff under the State's partial disability program is for four hours per day three days per week and is a position highly accommodated to her needs; that the position is temporary and would not be available for more than approximately four years; and that it would be extremely difficult for someone with plaintiff's limitations to find similar work in the general competitive labor market.

In light of these undisputed facts, the question before the Court is one of law, and we conclude, as a matter of law, that plaintiff has met her burden of establishing that, in light of her impairment, her age, her prior experience, and her lack of education, there are no general kinds of employment that would be suitable for her, and that it likely

---

**19.** Ind.Code §§ 22–3–1–1 to –12–5 (1993 & Supp.1997).

**20.** Although there is contradictory evidence on the question of whether plaintiff could perform

the offered work as a seamstress for four hours per day, three days per week, plaintiff's evidence that she was not capable of working full-time or half-time, stands uncontradicted.

would be futile for her to seek employment in the general competitive labor market. Although the State did put forth evidence that it had offered her a position as a seamstress, that position cannot constitute "reasonable employment" for at least two reasons, either of which, standing alone, is sufficient to demonstrate that the offered employment is not reasonable employment as a matter of law.

■ First, the temporary nature of the employment is in itself sufficient reason to conclude that it cannot constitute reasonable employment such that it defeats a claim of total permanent disability. If the post-injury employment lacks permanence and if it can fairly be said that, should the claimant lose that job, the claimant would have a hard time getting new work of a regular and continuous nature, a finding of total permanent disability is in order. *See generally* Larson, § 57.35, at 10–247 to –251, § 57.51(c), at 10–331 to –336.[21] Here, it is not disputed that the work offered plaintiff was temporary, and, in fact, because it was offered under the State's partial disability program, its duration is limited by regulation. *See* Ind.Admin.Code tit. 31, 3–1–12(a) (1996) (stating that long term disability benefit payments are limited to a maximum of four (4) years).

■ Second, work that is highly accommodated[22] to suit the needs and disabilities of a particular claimant cannot defeat a claim of total permanent disability where it is clear that the claimant could not find similar work under normally prevailing market conditions. "Wages paid an injured employee out of sympathy, or in consideration of his long service with the employer" do not reflect his actual earning capacity under normal market conditions and are to be discounted for the purposes of determining permanent disability. *See* Larson, § 57.34, at 10–239. "The same is true if the injured

man's friends help him to hold his job by doing much of his work for him, or if he manages to continue only by delegating his more onerous tasks to a helper, or if the work for which claimant is paid is 'made work' or 'sheltered work.'" *Id.* § 57.34, at 10–239 to –245. Similarly, an employer cannot avoid deliberately its duty to pay worker's compensation benefits simply by offering the employee work that is so highly accommodated to the employee's needs that it would not ordinarily be available under normally prevailing market conditions. *See Peoples v. Cone Mills Corp.,* 316 N.C. 426, 342 S.E.2d 798, 806 (1986).

Here, there is no question that the offered position was "highly accommodated." Ralph Hunter, the State's personnel officer, essentially testified that he would design the position around plaintiff's special needs, that they would permit her to work four hours a day three days per week, and that they would even provide her with a cot to lie down on as needed, and Thomas Roundtree, the State's vocational expert, agreed that the offered position was "highly accommodated" to plaintiff's needs. (R. at 437.) Moreover, plaintiff's vocational expert Archie Sanders testified that there were no categories of employment that plaintiff could perform on a full-time or half-time basis, and that there was no kind of job in the economy that he would recommend that she try. The State did not present contrary evidence. In fact, the functional capacity evaluation which it introduced stated in essence that, while in theory she could perform some sedentary work, in reality, "locating gainful employment with the limitations she demonstrated ... would be very difficult." (R. at 275–76.) Thus, if we accept the Board's conclusion that plaintiff could perform the offered seamstress position four hours per day three days per week, as we do in this opinion, it is clear

---

**21.** *See also Traders & General Ins. Co. v. Pittsford,* 411 S.W.2d 755, 756–58 (Tex.Civ.App.1967) (affirming a finding of total permanent disability; holding that a trainee position would not preclude a finding of total permanent disability because, should plaintiff lose this position, he could not go back to any of his previous types of occupations); *Kamensky v. State Compensation Comm'r,* 148 W.Va. 258, 134 S.E.2d 582, 583–84 (1964) (15 months of light duty, post-injury work

did not preclude a finding of total permanent disability because claimant's impairment would continue to make it difficult for him to find employment should his new position end, as it did here; reversed and remanded with directions to grant him an award of total permanent disability).

**22.** *See supra* note 2.

that, once the position ended as it certainly would given that it was temporary by design, it would be very difficult if not impossible for plaintiff to find other suitable work in the general competitive labor market. Even putting aside Sanders' testimony and the State's functional evaluation report, it is hard to imagine another position where a person with significant back problems, limited education, and experienced only in manual labor, would be hired to work only four hours per day three days per week and then be permitted to take breaks and lie down on a couch whenever her back bothered her and to meet no performance standards.[23]

Thus, because the offered employment was temporary and so highly accommodated to plaintiff's needs that, once the position would end, plaintiff would not likely be able to find other suitable employment in the general competitive labor market, the offered position is not reasonable employment and cannot defeat her claim for total permanent disability benefits.

■ We are constrained to make one final observation. While we applaud the State's effort to accommodate the disabled and to place those capable of working in accommodated positions under the State's partial disability program, the State cannot use this program to defeat an otherwise valid claim for total permanent disability under the worker's compensation laws. The worker's compensation scheme reflects a compromise struck by employers and injured workers. An employer is obligated to provide limited compensation to workers whose injuries and illnesses arise out of and in the course of their employment, regardless of fault, see Frampton, 297 N.E.2d at 427, and workers who were previously precluded from recovery under common law theories are thus guaranteed compensation. In exchange, an injured worker relinquishes the right to sue

his employer for negligence, and an employer's liability is thereby reduced. Id. Stated another way, the worker's compensation scheme becomes the worker's exclusive remedy. Ind.Code § 22–3–2–6 (1993). The scheme is designed to "shift the economic burden for employment related injuries from the employee to the employer and consumers of its products." Collins v. Day, 604 N.E.2d 647, 648 (Ind.Ct.App.1992), aff'd on other grounds, 644 N.E.2d 72 (Ind.1994). See also Frampton, 297 N.E.2d at 427.[24] In light of the exclusive nature of the worker's compensation remedy and the humanitarian purpose of the statutory scheme, it is particularly important that, as stated above, we construe the statute liberally in favor of the employee to effectuate its humanitarian purposes. Id.

The State does not assert that its partial disability program is a substitute for the worker's compensation scheme, and certainly nothing in Ind.Code § 5–10–8–7 (1993 & Supp.1997), the asserted statutory basis for the State's program, see supra note 7, can be read to limit an employee's entitlement to worker's compensation benefits if the statutory prerequisites have been met. In fact, the only mention of the worker's compensation benefits in § 5–10–8–7 is the subsection which provides that an employee's state disability benefits "may be reduced, dollar for dollar" if the employee derives income from one of several enumerated sources, including social security and worker's compensation. See Ind.Code § 5–10–8–7(d)(6)(A), (E); Ind.Admin.Code tit. 31, 3–1–22(a)(1), (6) (1996). Thus, while the State may, under the terms of the statute, reduce its award of disability benefits should an employee participate in its program while receiving worker's compensation benefits, it may not, by offering an injured employee under its partial disability program a temporary and highly accommodated position of the sort that would

23. See Jordan v. Decorative Co., 230 N.Y. 522, 130 N.E. 634, 635–36 (1921) (per Cardozo, J.) (noting that an injured, unskilled laborer, who couples his request for employment with notice that the labor must be light will quickly be put aside for more versatile laborers, and that work, if he gets it, is likely to be casual and intermittent). See also Smith v. Sealed Air Corp., 489 S.E.2d 445, 448 (N.C.App.1997) (noting that jobs in the competitive market are not customarily

designed with a view towards providing an employee with whatever help is needed to complete job tasks).

24. See generally Charles R. O'Keefe, Jr., The Guides to the Evaluation of Permanent Impairment and Workers' Compensation in Indiana, 27 Ind.L.Rev. 647, 649–50 (1994).

be difficult if not impossible to find in the general competitive labor market, preclude that employee from receiving total permanent disability benefits to which the employee would otherwise be entitled under the worker's compensation scheme.

## CONCLUSION

Accordingly, contrary to the decision of the Board and the Court of Appeals, we conclude that the temporary and highly accommodated position offered to plaintiff under the State's partial disability program as a matter of law cannot constitute reasonable employment which defeats her claim for total permanent disability. We, therefore, reverse the decision below and remand for further proceedings not inconsistent with this opinion.[25]

SHEPARD, C.J., and DICKSON and BOEHM, JJ., concur.

SULLIVAN, J., not participating.

25. With regard to plaintiff's request that she be granted "all other benefits available to her under the Act including mileage and continuing medical benefits," App.Br. at 50, on remand, the parties will have an opportunity to further address what, if any, additional or continuing benefits are appropriate.