## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 30 2015, 8:48 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

T. Reg Hesselgrave
Palguta & Hesselgrave
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Martin T. Spiegel
Spiegel & Cahill, P.C.
Hinsdale, Illinois

# IN THE
# COURT OF APPEALS OF INDIANA

Janet Daugherty,

*Appellant-Plaintiff,*

v.

Dollar Tree Stores, Inc.,

*Appellee-Defendant.*

November 30, 2015

Court of Appeals Case No.
93A02-1505-EX-393

Appeal from the Worker's Compensation Board of Indiana

Application No. C-197818

**Bradford, Judge.**

# Case Summary

[1]     Appellant-Plaintiff Janet Daugherty was an employee of Appellee-Defendant Dollar Tree Stores, Inc.  On May 20, 2007, while she was working, Daugherty

fell from a ladder.  In the years following the fall, Daugherty was treated for injuries to several different areas of her body.  The Indiana Workers Compensation Board ("the Board") found that Daugherty sustained compensable injuries to her left shoulder, left knee, and left upper extremity, but that her low back, cervical spine, right shoulder, and right knee conditions were not causally related to the work accident.  The Board also denied Daugherty's request for permanent total disability.  On appeal, Daugherty argues that there was insufficient evidence to support the Board's determinations.  We affirm.

# Facts and Procedural History

[2] On May 20, 2007, while Daugherty was working at Dollar Tree, she fell from near the top of an eight-foot ladder.  Over the subsequent seven years, Daugherty received treatment for several injuries, all of which she alleges were caused by the fall.  On April 29, 2014, Daugherty's worker's compensation claim was heard by a single member of the Indiana Worker's Compensation Board.  On January 12, 2015, the single Board member found that Daugherty had sustained compensable injuries to her left shoulder, left knee and left upper extremity as a result of the accident, but that injuries to her lower back, cervical spine, right shoulder, and right knee were not causally related to the accident. The single Board member also found that Daugherty suffered twelve percent permanent impairment and that Daugherty was not entitled to recover costs for future medical care, nor was she entitled to permanent total disability.

Daugherty appealed the single hearing member's decision to the full Board. On April 22, 2015, the Board slightly modified Daugherty's award, finding that she had suffered sixteen percent permanent impairment but affirming the single Board member's conclusions in all other respects. The Board's findings of fact and conclusions of law are as follows:

### Findings of Fact

1. On or about May 20, 2007, Defendant employed Plaintiff at an average weekly wage of $403.18.

2. On May 21, 2007, Plaintiff reported the following symptoms:

   - left knee pain and swelling
   - right wrist/forearm pain

   Plaintiff did not report other trauma, injuries or conditions on that date.

3. Plaintiff was diagnosed with a left meniscal tear. On July 20, 2007, she underwent a partial medial meniscectomy at Central Indiana Orthopedics ("CIO") and subsequently returned to work.

4. On September 18, 2007, Plaintiff reported increased left elbow pain and numbness after returning to work following knee surgery.

5. On October 31, 2007, Plaintiff was seen at CIO for left elbow pain. An EMG was positive for left carpal tunnel entrapment.

6. On November 28, 2007, Dr. Chen saw Plaintiff for left elbow pain with EMG evidence of carpal tunnel syndrome. Clinical testing, however, was negative, and there was no evidence of cubital tunnel syndrome. Dr. Chen described Plaintiff symptoms as diffuse and difficult to correlate, and recommended that Plaintiff obtain another opinion from Dr. Heavilon.

7. On December 12, 2007, Plaintiff saw Dr. Heavilon, who suggested a carpal tunnel injection. Plaintiff expressed frustration and wanted to seek consultation with another practice. Dr. Heavilon wrote that a rapport had not been established with the patient, and recommended that another opinion be obtained.

8. On January 15, 2008, Plaintiff was seen by Dr. Chen at CIO. Dr. Chen reported that carpal tunnel syndrome may have been responsible for part of Plaintiff's symptoms, but that a carpal tunnel release would not provide relief. He kept her on restrictions of no lifting, pulling or pushing more than 10 pounds, and referred her to the Indiana Hand Center.

9. On April 28, 2008, Plaintiff saw Dr. Macadaeg with neck pain and a secondary complaint of low back pain. This is the first notation of neck or back symptoms in Plaintiff's medical records. Plaintiff told Dr. Macadaeg that her symptoms began about one year ago after falling. Dr. Macadaeg recommended physical therapy. Defendant's claim representative was copied on Dr. Macadaeg's note.

10. Although Defendant was paid compensation for temporary disability for some periods of time, Plaintiff continued to work for Defendant intermittently.

11. Plaintiff testified that she sustained subsequent injury to her left knee while working with a pallet jack in July or August of 2008.

12. On August 19, 2008, Dr. Macadaeg noted Plaintiff's report that her neck symptoms had worsened. A cervical MRI revealed multilevel degenerative changes, including cervical spondylosis with disc bulging.

13. On August 29, 2008, Dr. Macadaeg recommended therapy and a possible injection. Dr. Macadaeg opined that Plaintiff's cervical spine problems were not amenable to surgical intervention.

14. Plaintiff did not feel that her left knee improved after the left medial meniscectomy of July 20, 2007, so her care was transferred to Dr. Bicos. On January, 19, 2009, Dr. Bicos ordered an MRI, leading to a diagnosis of recurrent left medical meniscus tear, left knee patellofemoral catching, and lower extremity numbness and weakness. Dr. Bicos also noted that Plaintiff had an antalgic gait, a positive straight leg test for radicular pain, and a negative log roll sign for left hip pain. Dr. Bicos suggested evaluation by a spine physician for Plaintiff's low back symptoms.

15. On March 27, 2009. Dr. Bicos performed a left knee arthroscopy, partial medial meniscectomy and chondroplasty.

16. On June 25, 2009, plaintiff consulted with Dr. Aitken at Rehabilitation Associates of Indiana. This referral was provided by Defendant.

17. Plaintiff underwent physical therapy at First Choice, where, on September 11, 2009, the therapist noted that Plaintiff's motivation was questionable.

18. On September 14, 2009, Dr. Bicos reported that Plaintiff's left knee condition was at maximum medical improvement. He imposed physical restrictions of no repetitive lifting, twisting or bending more than 15 times per hour. He reported that Plaintiff's left knee condition warranted a PPI rating of 8% to the left lower extremity or 3% to the whole person.

19. Plaintiff's treatment under the Act also included surgical repair of a left rotator cuff tear. On August 28, 2009, Dr. Kaplan reported that Plaintiff's left shoulder condition had reached maximum medical improvement. Dr. Kaplan imposed permanent restrictions, including no use of the left arm above shoulder level.

20. On December 31, 2009, the Board approved a Section 15 compromise agreement with respect to Plaintiff's left shoulder injury pursuant to which Defendant paid Plaintiff consideration of $6,850.00.

21. On January 10, 2010, Dr. Aitken confirmed that Plaintiff's left knee condition was at maximum medical improvement.

22. On April 22, 2010, Plaintiff returned to Dr. Aitken for low back and left knee pain.

23. On December 13, 2010, Plaintiff saw Dr. Gibson at the request of her attorney. Dr. Gibson reported that Plaintiff had a 7% PPI of the left lower extremity, and noted that Plaintiff needed additional care for her low back.

24. Dr. Gibson noted Plaintiff's reported history of low back and neck pain. Objectively, an MRI study dated November 26, 2010 demonstrated degenerative changes of the lumbar spine at L4-5, with bulging and compromise of the right nerve root. Notwithstanding the history reflected in Dr. Macadaeg's April 2008 report, Dr. Gibson wrote "it may be somewhat difficult to completely connect her back troubles to the injury of May of 2007."

25. On December 16, 2010, Plaintiff saw Dr. Phookan for right lower extremity pain. She reported back pain, on and off, for almost three years. She reported the onset of leg symptoms starting a year before. Dr. Phookan diagnosed a right L4-5 herniation and L5 radiculopathy and recommended surgery.

26. On January 10, 2011, Plaintiff underwent a right L4-5 microdiscectomy.

27. On February 18, 2011, Dr. Phookan released Plaintiff with lifting restrictions for three months, after which she was to have no restrictions.

28. Plaintiff saw a family physician, Dr. Kohles, for multiple conditions. On May 13, 2011, Plaintiff reported right knee pain. Dr. Kohles recommended a right knee MRI.

29. On July 7, Plaintiff returned to see Dr. Phookan with reports of left hip and left foot numbness. Dr. Phookan discussed a repeat lumbar MRI.

30. On August 17, 2011, Plaintiff saw Dr. Sexson for right knee pain that she reported had been ongoing since 2007. Dr. Sexson suspected mild patellofemoral joint inflammation. Dr. Sexson did not believe Plaintiff had a meniscal tear and did not feel surgery was warranted.

31. On September 9, 2011, Plaintiff saw Dr. Sorg at Community Spine, on referral from Dr. Kohles. Plaintiff reported that her low back pain had improved after the January 2011 surgery, but now reported new pain on the opposite side. Dr. Sorg recommended x-rays and physical therapy.

32. On November 7, 2011, Dr. Sorg ordered an MRI, which showed postoperative changes, but no recurrent disc herniations.

33. On January 20, 2014, Plaintiff was examined by Laura Holsey, D.O., who opined the following diagnoses were related to the May 20, 2007 incident:

- degenerative disc disease of the cervical spine with bulge and spurring at C3-4 and bulge and spurring at C4-5
- chronic headaches
- right and left shoulder pain, rotator cuff tears
- right bicipital tendinopathy from prior injury to the rotator cuff interval
- scarring of the biceps tendon
- small anterior osteophyte of the right shoulder
- right carpal tunnel syndrome

- left carpal tunnel syndrome with surgical repair and positive EMG findings
- torn medial meniscus, left knee, status surgical repairs
- antalgic gait
- lumbar/SI pain with signs of lumbosacral radiculopathy

34. Dr. Holsey reported that absent further treatment, Plaintiff would qualify for an 8% PPI to the cervical spine; 4% PPI to the right shoulder; 8% PPI to the left shoulder; an additional 9% PPI for left shoulder weakness; a 20% PPI to the left upper extremity for loss of grip strength; a 20% PPI to the right upper extremity for loss of grip strength; a 7% impairment to the left lower extremity for the left knee surgery; and a 10% PPI for the low back. Dr. Holsey combined these losses for a PPI of 45% to the whole person.

35. The Full Board does not give weight to the findings of Laura Holsey, D.O. with respect to PPI or to causation of the variety of conditions she attributes to the May 2007 incident. Some of these conditions did not arise or were not documented in the medical records until months or years after the work incident. Physicians such as Dr. Gibson, Dr. Sorg, Dr. Phookan and Dr. Aitken examined or treated Plaintiff prior to Dr. Holsey's 2014 report, and in the Board's view their notes does [sic] not establish a medical probability that many of the disputed conditions were work-related.

36. Michael Blankenship, a vocation expert, reported that Plaintiff is unable to resume any reasonable employment. Without rejecting Blakenship's findings on the vocational issue of disability, the Board rejects Plaintiff's claim for permanent total disability on other grounds. For example, Plaintiff continued to work for periods of time after the May 2007 work

incident, and the Full Board does not find that all of Plaintiff's disabling conditions are causally related to the May 2007 work incident.

37. Plaintiff receives Social Security Disability payments with a disability date of May 1, 2011.

## Conclusions and Award

1. Plaintiff sustained compensable injuries to her left shoulder, left knee, and left upper extremity in the May 2007 work incident.

2. Plaintiff received compensation for periods of temporary total disability but also continued to work intermittently after the May 2007 work incident.

3. The Full Board does not find by a preponderance of the testimony and evidence that the conditions of Plaintiff's low back, cervical spine, right shoulder and right knee were causally related to the work accident.

4. Pursuant to the discretion afforded by Ind. Code 22-3-3-10(i)(14), the Full Board awards to Plaintiff as against Defendant sixteen (16) degrees of permanent impairment for the left knee and left carpal tunnel injuries, without credit to Defendant for the $6,850.00 in consideration already paid for the left shoulder injury.

5. Plaintiff is not awarded compensation for permanent total disability under the Act with respect to the May 2007 work incident. Plaintiff continued to work after the May 2007 incident. Plaintiff's current disability status was caused in part by injuries or conditions the Board finds unrelated to the May 2007 work incident. The May 2007 work incident itself did not so devastate Plaintiff's condition as to preclude her from reasonable employment in the competitive economy.

6.  Plaintiff is not awarded palliative treatment for the compensable left shoulder, left carpal tunnel syndrome, or left knee injuries.

Appellant's App. pp. 1-6.

# Discussion and Decision

On appeal, Daugherty argues that (1) the Board's decision was not supported by the evidence and (2) Dollar Tree had a duty to secure an affirmative statement from a doctor that her neck and low back problems were unrelated to the work injury.

# I. Sufficiency of the Evidence Supporting the Board's Decision

Daugherty claims that the Board erred in finding that Daugherty's low back, cervical spine, and right shoulder injuries were not causally connected to her workplace fall and in finding that Daugherty is not permanently totally disabled as a result of the fall.

## A. Standard of Review

An injury arises out of employment when there is a causal relationship between the employment and the injury. *Muncie Indiana Transit Authority v. Smith*, 743 N.E.2d 1214, 1216 (Ind. Ct. App. 2001). A causal relationship exists when the injury would not have occurred in the absence of the accident. *See Daub v. Daub*, 629 N.E.2d 873, 877 (Ind. Ct. App. 1994) (noting that in a negligence action, a causal connection exists when the harm would not have occurred "but for" the defendant's conduct). The party seeking benefits bears the burden to prove that his or

her injury arose out of and in the course of employment. *Conway ex rel. Conway v. School City of East Chicago*, 734 N.E.2d 594, 598 (Ind. Ct. App. 2000), *trans. denied*. Ultimately, the issue of whether an employee's injury arose out of and in the course of his employment is a question of fact to be determined by the Board.

*Outlaw v. Erbrich Products Co.*, 777 N.E.2d 14, 26 (Ind. Ct. App. 2002).

[7] An unsuccessful claimant who seeks to challenge the denial of their application for benefits appeals from a negative judgment. *Perez v. U. S. Steel Corp.*, 428 N.E.2d 212, 216 (Ind. 1981). When reviewing a negative judgment issued by the Board,

> we will not weigh the evidence nor judge the credibility of witnesses. Rather, we examine the record only to determine whether there is any substantial evidence and reasonable inferences which can be drawn therefrom to support the Board's findings and conclusion. Only if the evidence is of a character that reasonable men would be compelled to reach a conclusion contrary to the decision of the Board will it be overturned.

*Id*. "Unless the evidence is 'undisputed and leads inescapably' to a result contrary to the Board's finding, it will be affirmed." *Hill v. Worldmark Corp./Mid Am. Extrusions Corp.*, 651 N.E.2d 785, 787 (Ind. 1995) (quoting *Rensing v. Ind. State Univ. Bd. of Trs.*, 444 N.E.2d 1170, 1172 (Ind. 1983)).

## B. Causation

[8] Dr. Holsey concluded that, among other things, Daugherty's low back, cervical spine, right knee, and right shoulder pain were caused by the work accident.

Daugherty argues that Dr. Holsey's conclusions are decisive on the issue of causation because no other doctor rebutted these statements or otherwise opined that Daugherty's injuries were not caused by the fall. However, the Board was not required to accept Dr. Holsey's conclusions as credible.

> [A]n expert's opinion may be so lacking in probative value as to be insufficient to prove the existence of a causal relationship. *See* [*Daub v. Daub*, 629 N.E.2d 873, 877 (Ind. Ct. App. 1994)]. While the admissibility of an expert's opinion does not require the expert to couch an opinion in terms of a particular level of certainty, an opinion regarding causation that lacks reasonable certainty or probability is insufficient by itself to support a judgment. *Noblesville Casting Div. of TRW v. Prince*, 438 N.E.2d 722, 731 (Ind. 1982).… Ultimately, the Board is free to accept or reject expert testimony. *Hill*, 651 N.E.2d at 787.

*Outlaw*, 777 N.E.2d at 29.

[9] The Board clearly explained why it did not give weight to Dr. Holsey's conclusions.

> The Full Board does not give weight to the findings of Laura Holsey, D.O. with respect to PPI or to causation of the variety of conditions she attributes to the May 2007 incident. Some of these conditions did not arise or were not documented in the medical records until months or years after the work incident. Physicians such as Dr. Gibson, Dr. Sorg, Dr. Phookan and Dr. Aitken examined or treated Plaintiff prior to Dr. Holsey's 2014 report, and in the Board's view their notes does [sic] not establish a medical probability that many of the disputed conditions were work-related.

Appellant's App. p. 5. Dr. Holsey did not examine Daugherty until January 20, 2014, nearly seven years after the accident. As such, it was reasonable for the Board to give more weight to the records of the treating physicians than to Dr. Holsey's conclusions. Furthermore, as stated above, we do not reweigh the evidence or judge the credibility of witnesses. *Perez*, 428 N.E.2d at 216.

[10] The following evidence supports the Board's decision that Daugherty's low back, cervical spine, right knee, and right shoulder injuries were not causally connected to her workplace fall: (1) Daugherty first complained of low back pain on April 28, 2008, approximately one year after her accident; (2) on April 22, 2010, Daugherty again complained of low back pain which she said had been bothering her for "the past couple of months," tr. vol. II, p. 3, (3) on November 26, 2010, Dr. Gibson opined that "it may be somewhat difficult to completely connect her back troubles to the injury of May of 2007," appellant's app. p. 4; (4) Daugherty's first complaint of right knee pain was documented by Dr. Kohles on May 13, 2011, at which time she indicated that she had been experiencing right knee pain for a week; (5) on July 11, 2007, Daugherty saw Dr. Marshall Trusler for her left knee pain and Dr. Trusler conducted right knee, left knee, and head and neck examinations and found that "[t]here is normal motion in the right knee. No swelling….No tenderness….Normal strength in the right lower extremity," and no issues with the head or neck, ex. vol. III, p. 8; (6) Daugherty's first complaint of neck pain was documented November 16, 2007; and (7) there is no record of right shoulder pain until January 20, 2014.

[11] Daugherty testified that she did notify her doctors of her neck and back pain shortly after the accident but that the doctors decided to focus on her more severe injuries (her left knee and left shoulder) before addressing her back and neck issues. Daugherty does not explain why the doctors' notes do not reflect that she complained of back or neck pain.

> When a conflict in the evidence arises we will consider only the evidence tending to support the Board's award and which is most favorable to the appellee. Given substantial evidence supporting its determination, the Board's ultimate factual conclusion must be upheld although this Court might have reached another had it been the trier of fact.

*Tanglewood Trace v. Long*, 715 N.E.2d 410, 412 (Ind. Ct. App. 1999) (quoting *Grand Lodge Free & Accepted Masons v. Jones*, 590 N.E.2d 653 (Ind. Ct. App. 1992)).

[12] Daugherty also testified that she now suffers from nearly constant and debilitating neck and low back pain. However, in August of 2008, when she was examined following her initial cervical MRI, Dr. Daniel Harris described Daugherty's cervical spine condition as "relatively mild," appellant's app. p. 43, and Dr. Macadaeg described Daugherty as being in "no apparent distress," that her "[n]eck range of motion [was] full," that her "muscle strength [was] 5/5," that physical work restrictions were unnecessary, that she was not at risk of further injury, and he recommended a "conservative approach" to treat her pain. Appellant's App. p. 41.

Ultimately, the Board had substantial evidence to support its conclusion that Daugherty failed to prove by preponderance of the evidence that her low back, spine, right knee, and right shoulder conditions were not causally related to the work accident. Daugherty is correct that there is evidence supporting an inference that her injuries were caused by her work accident; however, that fact does not negate the evidence in favor of the Board's decision. Daugherty's argument is essentially a request for this court to reweigh the evidence, which we will not do. *Perez*, 428 N.E.2d at 216

## C. Permanent Total Disability

To establish "permanent total disability," a claimant must establish that they "cannot obtain or perform 'reasonable' types of employment" for the remainder of their life. *Walker v. State, Muscatatuck State Dev. Ctr.*, 694 N.E.2d 258, 265 (Ind. 1998) (citing *Perez*, 428 N.E.2d at 215-16).

With regards to permanent total disability, the Board found as follows,

> Michael Blankenship, a vocational expert, reported that Plaintiff is unable to resume any reasonable employment. Without rejecting Blakenship's findings on the vocational issue of disability, the Board rejects Plaintiff's claim for permanent total disability on other grounds. For example, Plaintiff continued to work for periods of time after the May 2007 work incident, and the Full Board does not find that all of Plaintiff's disabling conditions are causally related to the May 2007 work incident.
>
> * * *
>
> Plaintiff is not awarded compensation for permanent total disability under the Act with respect to the May 2007 work incident. Plaintiff continued to work after the May 2007

incident. Plaintiff's current disability status was caused in part by injuries or conditions the Board finds unrelated to the May 2007 work incident. The May 2007 work incident itself did not so devastate Plaintiff's condition as to preclude her from reasonable employment in the competitive economy.

Appellant's App. pp. 5-6.

[16] The Board's conclusion was based on reasonable inferences from evidence in the record. Following the May 2007 injury, Daugherty continued to work for Dollar Tree with moderate lifting restrictions until she was fired on September 9, 2009. Daugherty admitted that while working at Dollar Tree following the May 2007 accident, she regularly exceeded her lifting restrictions. Daugherty also did not begin receiving Social Security Disability benefits until May 1, 2011. In light of the fact that Daugherty was able to continue her work at Dollar Tree following the accident for nearly two-and-a-half years with only moderate and intermittent restrictions, we find that there was substantial evidence to support the Board's determination that "[Daugherty's] current disability status was caused in part by injuries or conditions the Board finds unrelated to the May 2007 work incident," and that "[t]he May 2007 work incident itself did not so devastate Plaintiff's condition as to preclude her from reasonable employment in the competitive economy." Appellant's App. p. 6. As such, the Board did not abuse its discretion by denying Daugherty's request for permanent total disability benefits.

## II. Employer's Duty to Treat Potential Injuries

Finally, Daugherty argues that following Dr. Macadaeg's August 29, 2008 recommendations to treat her neck pain, Dollar Tree had a duty to expeditiously follow up with the recommended treatments or secure an affirmative statement from a physician that Daugherty's neck and low back issues were not causally related to the work injury. Daugherty contends that the Board's finding that Dollar Tree was not responsible for her back and neck injuries works to "defeat the Act's humanitarian purposes by lengthening proceedings, delaying treatment, and increasing costs which are not reimbursed by the Act." Appellant's Br. p. 20.

First, Daugherty claims that "Dollar Tree refuse[d] to provide any further care and treatments of the low back or of the neck" after Dr. Macadaeg's August 2008 treatment recommendations. Appellant's App. p. 4. However, Daugherty cites no evidence in the record to suggest that Dollar Tree disallowed Daugherty to pursue further treatment for her neck or low back; rather, there is simply no mention of Daugherty complaining of low back or neck pain again until almost two years later in April of 2010. In fact, Dr. Macadaeg instructed Daugherty to "follow up with [him] on an as needed basis." Appellant's App. p. 39.

Moreover, Daugherty cites no authority to support her argument that Dollar Tree has a duty to disprove causation as a result of failing to pay for the treatment of injuries that are not clearly a result of the workplace accident.

Accordingly, we find that the Board did not err in declining to find that Dollar Tree had a duty to provide treatment for injuries which were not clearly causally connected to Daugherty's fall.

[20]     The judgment of the Board is affirmed.


Baker, J., and Pyle, J., concur.