In the

# United States Court of Appeals

### For the Seventh Circuit

No. 02-1178

ROBERT PETERS,

*Plaintiff-Appellant*,

*v.*

CITY OF MAUSTON,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 01-C-247-C—**Barbara B. Crabb**, *Chief Judge.*

ARGUED SEPTEMBER 18, 2002—DECIDED NOVEMBER 20, 2002

Before BAUER, MANION, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiff Robert Peters ("Peters") brought an action for disability discrimination pursuant to the Rehabilitation Act of 1973 against his employer, the City of Mauston, Wisconsin ("the City"), when the City terminated Peters after he suffered a work-related injury. Assuming, solely for the purpose of summary judgment, that the City regarded Peters as disabled, the district court granted summary judgment in favor of the City. Specifically, the court found that Peters' requested accommodation was unreasonable because it eliminated an essential function of his job as an Operator. Peters appeals the district court's determination that heavy lifting was an essential function of his job as well as the district court's find-

ing that his proposed accommodation was unreasonable. We affirm.

## BACKGROUND

### A.  Peters' Employment History with the City

Peters began his employment with the City of Mauston, Wisconsin, in March 1968 upon his graduation from high school. He worked for the City for approximately nine years before he quit to work in construction. Peters then returned to his employment with the City as an Operator in 1978 and remained in that position until his termination on March 15, 1995.

The City has two job classifications relevant to Peters' case: Operator and Laborer. As an Operator, Peters' duties included using various construction equipment as well as being able to perform all duties assigned to Laborers. A Laborer performs a wide range of construction tasks, including the lifting of heavy objects. Laborers, however, are not authorized to use the construction equipment, as operation of the equipment is left solely to the Operators, who are generally in charge on the worksite. According to the City, the job of an Operator is relatively unpredictable and includes such duties as: excavating trenches for replacement or repair of existing water, wastewater, and storm water mains and laterals; removing snow and ice accumulations from streets and sidewalks; trimming trees and cutting brush; and performing maintenance on equipment.

During the three years prior to his termination Peters suffered two work-related injuries to his shoulders. The first injury occurred to his right shoulder in 1992, and after surgery in August 1992, he returned to work in the late fall of 1993. In early 1994, Peters injured his left shoulder when he was thrown against the windshield of his truck while plowing snow. He underwent surgery

for this injury as well and missed work from June 1994 through March 1995, when he was terminated.

While Dr. Thomas G. Hoeft provided Peters' medical care following his second injury, the City's workers' compensation insurer sent Peters to Dr. Ronald C. Rudy for an independent medical evaluation on September 1, 1994. Dr. Rudy's report indicated that Peters could return to work after one month and with no restrictions following Peters' completion of physical therapy. On October 6, 1994, however, Dr. Hoeft recommended that Peters return to light duty with restrictions prohibiting Peters from lifting over thirty pounds, repetitive shoveling, and overhead use of the left hand.

On November 17, 1994, Peters met with his supervisor, Patrick Giesendorfer, the Director of Public Works, to discuss his ability to return to work and the conflicting doctors' reports. Giesendorfer informed Peters that he needed to secure a release from Dr. Hoeft because Dr. Hoeft was Peters' personal physician and had indicated that Peters still had some work restrictions. Peters told Giesendorfer that he had been working hard during his time off by painting three rooms and varnishing the floors in his house, cleaning out his garage, and building deer stands.

On November 21, 1994, Devin Willi, the City Administrator, wrote to both Peters and Dr. Hoeft requesting that Peters undergo a functional capacity evaluation, which would determine Peters' work capabilities and restrictions, and that Peters secure a work release from Dr. Hoeft. Dr. Hoeft did not respond to Willi's letter of November 21. On both December 28, 1994, and February 20, 1995, Willi again wrote to Dr. Hoeft seeking confirmation of Peters' status and the scheduled functional capacity evaluation. Dr. Hoeft did not immediately reply to either request. On February, 21, 1995, Willi wrote to Peters and informed him that it was his (Peters') responsibility to secure the report and release from Dr. Hoeft.

Dr. Hoeft finally forwarded the results of Peters' functional capacity evaluation to Willi on February 22, 1995. The report indicated that during an eight-hour work day, Peters could work with the following restrictions: 1) that he could never lift or carry anything in excess of fifty pounds; 2) that he could occasionally (11-30% of the day) lift or carry between twenty-one and fifty pounds; 3) that he could frequently (31-70% of the day) lift or carry between eleven and twenty pounds; 4) that he could continuously (71-100% of the day) lift or carry between one and ten pounds; and 5) that he could occasionally (11-30% of the day) shovel. Dr. Hoeft also determined that during an eight-hour work day Peters could use his left arm and shoulder continuously for only two hours and for no more than six hours total. The report indicated that these restrictions were permanent and that Peters fell into a "medium demand" job classification. Finally, Dr. Hoeft stated that if Peters "were likely to have additional demands placed on him, and in an unpredictable way, he might be better served by seeking a different occupation."

On February 28, 1995, Willi and Giesendorfer discussed the report with Peters. At this meeting, Peters expressed his interest in returning to work as well as his concern about performing some of the job's functions. Willi then took Dr. Hoeft's report and a summary of the February 28 meeting to the City's Personnel Committee, which directed Willi to meet with Peters again and discuss every element of Peters' job description to determine Peters' view on performing each task, including any accommodations that could be made.

Pursuant to this direction, Peters, Willi, and Giesendorfer met again on March 13, 1995. At this meeting Willi went through the job descriptions for Operators and Laborers line by line and asked Peters whether there were any accommodations that could be made to help him perform his job. Peters responded by saying either that he could

do the work and saw no problem, or that he was uncertain and would only know if he tried to do the work. Peters apparently had trouble understanding the concept of accommodation and was not aware that Dr. Hoeft listed his work restrictions as permanent. When asked specifically about those restrictions, Peters said he thought his shoulder would get better over time, but that if the lifting required by the job became too heavy, someone would probably have to help him. According to Peters, he tried to indicate that he wanted to "try and see" whether he could do the job by returning to work.

Willi reported the results of the meeting to the City's Common Council on March 14, 1995. The Council reviewed Dr. Hoeft's functional capacity report, Willi's report of the interview with Peters on March 13, and the list of duties for Peters' job. The Council determined that Peters could not "safely, reasonably, and effectively" perform the duties of an Operator in light of the permanent lifting restrictions placed upon Peters by his doctor. The Council based this decision upon its assessment that Peters' job required lifting, carrying, and extensive use of his shoulder.

Following that meeting, Willi informed Peters that the City decided to terminate his employment on March 15, 1995. Because there were no other vacancies in the City at that time, the Council did not consider whether Peters could perform any other job within the City. The Council, likewise, did not consider whether Peters could perform any type of job outside of the City and did not discuss with him his ability to find work elsewhere. Peters, however, indicated that he did not feel physically limited by his shoulder and believed that he could do the work.

After his termination, Peters found various jobs in construction and as a truck driver. This work required him to do heavy lifting and carrying, all of which he was able

to complete without limitation. Interestingly, on February 13, 1996, Dr. Hoeft revised Peters' functional capacity evaluation and lifted the permanent lifting restrictions entirely. Peters claims that Dr. Hoeft never actually evaluated him for the initial functional capacity evaluation but relied only upon the reports of nonphysician staff to form his conclusions.

Peters eventually filed a grievance over his termination, which was heard on August 6, 1998. On March 7, 2000, an arbitrator found that the City lacked "just cause" under its collective bargaining agreement for terminating Peters. The arbitrator reinstated Peters to his job as an Operator with the City but did not award back pay. In deciding not to award back pay, the arbitrator noted that it was Peters' own doctor who imposed the erroneous lifting restrictions and that, as a result, Peters must bear the wage loss. Peters resumed his job as an Operator shortly after the arbitrator issued his decision and, as far as the record reflects, has since performed the job satisfactorily.

## B. The District Court's Grant of Summary Judgment for the City

On March 8, 2001, Peters initiated the instant case against the City in state court under the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 794(a), in order to recover back pay. The Rehab Act prohibits a federal grant recipient from discriminating against a "qualified individual with a disability" solely by reason of his or her disability. Peters initially alleged that the City failed to reasonably accommodate him prior to terminating his employment and that the City discriminated against him in terminating his employment. The City removed the case to federal court on September 27, 2001, and filed a motion for summary judgment.

In its motion, the City argued that Peters was not disabled as defined under the Rehab Act, that it did not fail to reasonably accommodate Peters, and that it did not discriminate against Peters when it terminated his employment. Peters responded that he had a "record of" a disability and that the City "regarded him as disabled" in the major life activities of lifting and working, and he again argued that the City discriminated against him by failing to reasonably accommodate him and by terminating his employment. The district court, however, found that Peters failed to advance any supporting argument on the latter discrimination argument and did not address that claim.

The district court granted the City's motion for summary judgment on December 20, 2001, holding that Peters was not actually disabled and that he did not have a record of a disability. The court assumed, solely for the purpose of summary judgment, that the City may have regarded Peters as disabled because Peters' supervisor may have known of his condition and may have believed that it affected his ability to work in general. Thus, the court treated Peters as though he fell within the scope of the Rehab Act.

In granting summary judgment for the City, the district court held that heavy lifting constituted an essential function of an Operator's job and that Peters did not request a reasonable accommodation when he said that others may have to help him lift heavy objects. The court did not discuss whether Peters' proposed "try and see" accommodation would be reasonable, whereby Peters would try to do his job without exceeding his lifting restrictions or receiving help from others. The district court entered summary judgment in favor of the City on December 21, 2001, and Peters timely filed this appeal.

## ANALYSIS

### A.  Standard of Review

We review the district court's grant of summary judgment *de novo* drawing all reasonable inferences in favor of the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). In deciding an appeal, this Court may affirm the grant of summary judgment on grounds different from that of the district court. The alternative grounds, however, must have adequate support in the record and the law. *Id.*

### B.  Whether Peters Was "Disabled" Under the Rehabilitation Act

The Rehabilitation Act of 1973 protects a "qualified individual with a disability" from discrimination solely because of the person's disability by any program receiving federal financial assistance. 29 U.S.C. § 794(a) (2002). The Rehab Act defines an "individual with a disability" as one who: 1) has a physical or mental impairment that substantially limits one or more major life activities; 2) has a record of such an impairment; or 3) is regarded as having such an impairment by the person's employer. 29 U.S.C. § 705(20)(B) (2002). This Court looks to the standards applied under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12111 *et seq.*, to determine whether a violation of the Rehab Act occurs in the employment context.  29 U.S.C. § 794(d); *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995). Under the ADA, a "qualified individual with a disability" is one who, with or without reasonable accommodation, can perform the essential functions of the job. 42 U.S.C. § 12111(8) (2002).

In order to determine whether Peters falls within the statutory meaning of "disabled," we begin by noting that

Peters concedes that he did not suffer from an actual physical or mental impairment that substantially limited a major life activity and that he did not have a "record of" such a disability. So, the issue before this Court is whether the City regarded him as disabled under § 705(20)(B)(3).

Under the "regarded as" prong, a plaintiff may prove he is disabled by showing that either: 1) the employer mistakenly believes the employee has a physical impairment that substantially limits a major life activity; or 2) the employer mistakenly believes that an actual, non-limiting impairment substantially limits a major life activity. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001) (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)); *see also* 29 C.F.R. § 1630.2(l). In other words, the employer "must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999); *see also Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 954 (7th Cir. 2000).

Though Peters initially argued that the City regarded him as substantially limited in the major life activities of lifting and working, he abandoned the lifting argument at oral argument before this Court. Thus, he now argues only that the City regarded him as disabled in the major life activity of working. To be sure, working constitutes a major life activity under the ADA and the Rehab Act. *Amadio*, 238 F.3d at 925; *Moore*, 221 F.3d at 953. Thus, the question is whether Peters demonstrated that the City believed his shoulder injury substantially limited his ability to work in general.

To be substantially limited in general, a person must be "either unable to perform a major life function, or [be]

significantly restricted in the duration, manner, or condition under which the [person] can perform a particular major life activity, as compared to the average person in the general population." *Contreras v. Suncast Corp.*, 237 F.3d 756, 762 (7th Cir. 2001). With respect to working, the person must be significantly restricted in the ability to perform a class or broad range of jobs. The determination of whether or not one is substantially limited in working is an individualized one, and we will consider the number and type of jobs from which a person is disqualified, the geographical area to which the person has reasonable access, and the individual's job expectations and training. *Moore*, 221 F.3d at 953.

It is clear, however, that an employer does not regard a person as disabled simply by finding that the person cannot perform a particular job. *Byrne v. Bd. of Educ., Sch. Of West Allis–West Milwaukee*, 979 F.2d 560, 567 (7th Cir. 1992). Likewise, we previously declined to hold that a perception of disability arises solely from the employer's termination of the plaintiff because an impairment prohibits the employee from performing the job according to the employer's standards. *Moore*, 221 F.3d at 954. A terminated employee must present some evidence "'of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs . . . from which an individual would be excluded because of an impairment.'" *EEOC v. Rockwell Int'l Corp.*, 243 F.3d 1012, 1017 (7th Cir. 2001).

Though this Court declined in *EEOC v. Rockwell International Corp.* to adopt a per se rule that a plaintiff cannot prevail without qualitative evidence of the local job market, we still require that at least some such evidence be presented. *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 507 (7th Cir. 1998) ("This is not an onerous requirement, but it does require at least some evidence from which one might infer that [the plaintiff] faced 'significant

restrictions' in [his] ability to meet the requirements of other jobs"); *see also Rockwell Int'l*, 243 F.3d at 1018.

We have already held that a person is not disabled where the plaintiff's evidence that he was substantially limited in working consisted of a physician-imposed forty-five pound lifting restriction and a prohibition against "strenuous work" or driving a forklift for more than four hours a day. *Contreras*, 237 F.3d at 763. The *Contreras* Court noted that such evidence did not "even [hint] at the notion that [the plaintiff] is precluded from a broad class of jobs." *Id.*

In the case at bar, Peters in no way presented evidence that he was substantially limited in his ability to work or that the City regarded him as such. In fact, Peters fully demonstrated that he was still able to work. First, Peters continually told City officials that he did not feel limited by his shoulder. He informed his supervisor, Patrick Giesendorfer, that he painted three rooms and varnished the floors in his house, cleaned out his garage, and built deer stands during his time off from June 1994 through March 1995.

Second, Peters only presented evidence of his physician-imposed restrictions, which are hardly distinguishable from those in *Contreras*. To begin, Peters' physician imposed a fifty pound lifting prohibition, and Contreras' doctor imposed a forty-five pound prohibition. Dr. Hoeft categorized Peters' ability to lift various weights throughout the day, whereas Contreras' physician prohibited him from engaging in "strenuous work." Based on Peters' permanent restrictions, it is apparent that for most of the working day Peters could not engage in strenuous lifting. At most, he could shovel or carry between twenty-one and fifty pounds for only thirty percent of the day, and he could carry between eleven and twenty pounds for a maximum of seventy percent of the day. Furthermore,

Peters' permanent restrictions limited the use of his left arm and shoulder to a total of six hours in an eight-hour work day.

Peters argues that Dr. Hoeft's report, upon which the City relied, classified him in a "medium demand" job category and that this classification is evidence that he was precluded from all "heavy demand" labor jobs. Peters, however, provides no evidence to distinguish between so-called medium and heavy demand labor jobs. He simply asserts that the Operator's position is a heavy demand job and, therefore, that Dr. Hoeft's evaluation precluded him from it and similar jobs. Peters, however, did not indicate what those similar jobs might be. Without supporting evidence, we do not find Peters' argument persuasive.

The City also demonstrated that it never considered whether Peters was able to complete another job within the City because there were none vacant at the time it terminated him. Likewise, the City's Common Council never considered whether Peters could perform another job outside of the City. The City relied upon Peters' own physician-imposed, permanent restrictions in evaluating whether he could safely perform the job of an Operator and concluded that he could not. While Dr. Hoeft ultimately lifted those restrictions, at the time the City considered Peters' ability to do the job those lifting restrictions were classified as permanent. We cannot say that the City regarded Peters as substantially limited in his ability to work when it knew of his work during June 1994 through March 1995 and never considered his fitness for a job other than that of Operator.

Finally, Peters demonstrated to this Court that he was clearly capable of working after being terminated by the City. In fact, Peters found various jobs in construction and as a truck driver following his termination. This work required heavy lifting and carrying, all of which he was able to complete without limitation.

While the district court assumed for summary judgment purposes that the City may have regarded Peters as disabled, we hold that Peters does not fall within the meaning of "disabled" under the Rehab Act because he was not substantially limited in the major life activity of working despite his shoulder injury. The City did not regard Peters as disabled, and the district court correctly entered summary judgment in favor of the City.

### C. Whether Peters Was a "Qualified Individual With a Disability"

Even if we were to assume, as the district court did in awarding summary judgment, that the City regarded Peters as disabled, Peters' still does not fit the statutory definition of a "qualified individual with a disability." 42 U.S.C. § 12111(8). The first step in determining whether Peters was a "qualified individual with a disability" requires this Court to determine whether Peters satisfies the prerequisites of the job, in terms of skills or experience. If he does, then we must determine whether he can perform the essential functions of the job with or without a reasonable accommodation. *Bombard*, 92 F.3d at 563. The City does not argue that Peters was unqualified for the job. So, the only issue is whether Peters can perform the essential functions of the Operator's job with or without a reasonable accommodation.

Peters first argues that the district court improperly held that the heavy lifting from which Dr. Hoeft restricted him is an essential function of the Operator's job. The City, not surprisingly, asserts that such lifting is an essential function because the Operator must be able to perform all of the daily operational and construction tasks assigned to Laborers, which include all kinds of lifting and carrying. Because we do not second-guess the employer's judgment as to the essential functions, we affirm the

district court's determination that lifting, heavy or otherwise, is an essential function of the Operator's job. *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998). Even Peters admits that heavy lifting is required at times, and his argument that such lifting is infrequent does not preclude it from being an essential function of the job. *See Basith v. Cook County*, 241 F.3d 919, 929 (7th Cir. 2001) ("an essential function need not encompass the majority of an employee's time, or even a significant quantity of time, to be essential").

We now turn to Peters' requested accommodations. Peters requested two possible accommodations, neither of which this Court finds reasonable. Peters first requested that someone else do the heaviest lifting for him if he could not handle it, which the district court found unreasonable. We agree and hold that such a request is unreasonable because it requires another person to perform an essential function of Peters' job. *See Hansen v. Henderson*, 233 F.3d 521, 523-24 (7th Cir. 2000) (stating that an employer need not create a new job or provide a helper as an accommodation to a disabled employee); *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997) ("to accommodate him [the employer] would have to hire someone else to help perform some duties. That clearly was beyond a reasonable accommodation."); *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912 (7th Cir. 1996) ("hiring a helper to perform the overhead work would mean the helper would de facto perform [the] job. We cannot agree that [an employee] would be performing the essential functions of his job with a helper.").

Second, though the district court did not address this issue, we hold that Peters' proposed "try and see" request is also unreasonable. Allowing the employee to return to work to see if he can complete the job is the wrong test as to whether an accommodation is reasonable. *See Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599, 603 (7th

Cir. 1999). The employer is not obligated to allow the employee to try the job out in order to determine whether some yet-to-be requested accommodation may be needed. While the law gives the disabled employee the right to perform the job without a reasonable accommodation, the City determined that Peters could not safely perform the tasks assigned to an Operator because of his permanent, physician-imposed lifting restrictions. Given the permanent nature of those lifting restrictions at that time, we cannot say that Peters would have been able to complete the job without a reasonable accommodation. Absent any other reasonable request for an accommodation, the City need not incur additional liability to "try and see" whether Peters can handle the job despite his permanent lifting restrictions.

Accordingly, we hold that Peters failed to request any reasonable accommodation and he does not meet the statutory definition of a "qualified individual with a disability." Summary judgment in favor of the City is appropriate, and we AFFIRM the district court's decision.

A true Copy:

      Teste:

                    _____
                    *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*