

FILED

Oct 21 2020, 10:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Kevin D. Koons
Joseph C. Pettygrove
Kroger, Gardis & Regas, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Michael C. Healy
Staff Counsel
Indiana Civil Rights Commission
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Belterra Casino, <br><br> *Appellant-Respondent/Cross-Appellee,* <br><br> v. <br><br> Yufen (He) Dusan, <br><br> *Appellee-Complainant/Cross-Appellant* | October 21, 2020 <br><br> Court of Appeals Case No. 19A-EX-2650 <br><br> Appeal from the Indiana Civil Rights Commission <br><br> Caroline A. Stephens Ryker, Administrative Law Judge <br><br> ICRC No. EMha13101544 <br> EEOC No. 24F-2014-0051 |

**Crone, Judge.**

## Case Summary

[1] Belterra Casino hired Yufen (He) Dusan, a Chinese national, as a guest room attendant. Dusan injured her back and was placed on medical restrictions that could not be accommodated in her current position. Belterra gave Dusan a list of open positions, told her to work with human resources if she had any questions, and informed her that her employment would be terminated if she did not find a new position within thirty days. Dusan did not apply for any positions, stopped going to work, and was terminated. Dusan filed a complaint with the Indiana Civil Rights Commission (the Commission), alleging that Belterra had discriminated against her based on national origin and disability. After a hearing, an administrative law judge (ALJ) dismissed Dusan's national origin claim but ruled in her favor on her disability claim, concluding that Belterra discriminated against her by failing to provide her with a reasonable accommodation for her disability. The ALJ awarded Dusan $76,583.41 in back pay but rejected her request for front pay. The Commission affirmed and adopted the ALJ's order as its final order.

[2] Belterra now appeals, arguing that the Commission applied an incorrect burden of proof, erred in finding that Dusan could perform the essential functions of a barista with or without an accommodation, and erred in finding that extending Dusan's job-search period was a reasonable accommodation. Dusan cross-appeals, arguing that she is entitled to front pay and more back pay. We agree with Belterra and therefore reverse the Commission's ruling in favor of Dusan.

# Facts and Procedural History[1]

In October 2013, Dusan filed a complaint with the Commission alleging that Belterra had discriminated against her based on national origin and disability. An ALJ held five days of hearings in December 2018 and February 2019. In May 2019, the ALJ issued an initial order with the following relevant findings:[2]

> 1. Belterra is a resort and casino property located in Florence, Indiana that employs more than 900 employees.
>
> 2. Dusan is a Chinese national who at the time relevant to her complaint lived and worked in Indiana.
>
> 3. In 2010, Belterra hired Dusan as a Guest Room Attendant. As a Guest Room Attendant, Dusan was responsible for cleaning hotel rooms on Belterra's property, which included a great deal of manual labor like cleaning bathrooms, moving furniture, making beds, taking out trash, and vacuuming.
>
> 4. Although Dusan spoke very little English, Dusan was generally able to communicate with her supervisors and co-workers concerning the day-to-day functions of her position as Guest Room Attendant. However, communication was often complicated by the language barrier because Dusan primarily spoke, and still primarily speaks, Cantonese.

---

[1] Indiana Appellate Rule 46(A)(6)(b), which is made applicable to appellees via Appellate Rule 46(B), provides that facts "shall be stated in accordance with the standard of review appropriate to the judgment or order being appealed." Belterra points out that Dusan—who is represented by the Commission's staff counsel on appeal—"states as 'facts' only her version of events and evidence favorable to her, without alerting this Court that the Commission found otherwise based on the evidence before it." Appellant's Reply Br. at 12. Because Dusan does not specifically allege, let alone establish, that the Commission's factual findings are not supported by substantial evidence, we have disregarded any statements in her brief that are inconsistent with those findings.

[2] We have replaced references to Complainant and Respondent with Dusan and Belterra, respectively.

….

7.  On April 16, 2012, Dusan sustained a back injury while cleaning a room on Belterra's property.  Dusan reported the injury to her supervisors.…

8.  Dusan arrived at work on April 19, 2012, her next scheduled work day, and requested to see a doctor for the first time.… Dusan's Housekeeping Supervisor sent Dusan to Belterra's Worker's Compensation Clinic, the Carrol [sic] County Memorial Hospital ("Clinic"), to receive treatment from Dr. Nunnelley.…

….

10.  Dusan's April 19, 2012 visit to the Clinic resulted in medical restrictions, including 1) not lifting over five (5) pounds, 2) minimized stooping, bending, or twisting, 3) no squatting, climbing, or crawling, and 4) working in a sit down job only. Her restrictions remained largely unchanged until June 6, 2012 when the limitation of a sit down only job was removed and September 6, 2012 when her weight limit was changed to ten (10) pounds.  Her permanent restrictions of limited bending and a lifting limit of ten (10) pounds went into effect on November 9, 2012 when Dusan's physician determined she had reached maximum medical improvement ("MMI").  At no time did Dusan's physician ever restrict Dusan's ability to engage in pushing or pulling.

11.  As with other employees, Belterra accommodated Dusan's physician-imposed restrictions through the transitional or "light" duty program ("transitional duty program").  Through the transitional duty program, employees were assigned a set of individually customized tasks within their physician's restrictions with the goal of keeping the affected employees engaged in the workforce.  The tasks assigned, which did not constitute a

position, were based on the employee's restrictions and the availability of work. Because no business need existed for the tasks performed, transitional duty was designed to end once the employee reached MMI.

12. Dusan provided her physician's restrictions to [Belterra's risk and safety manager, Lee Smela,] so that Smela could assign compatible tasks. Accordingly, Dusan was placed on transitional duty in the laundry room because her restrictions could not be accommodated in the Guest Room Attendant position.…

….

16. Once Dusan reached MMI, Belterra's policy required that Dusan return to regular work. As the first step in the process, Smela reviewed Dusan's restrictions and the essential functions of her current position as a Guest Room Attendant to see if she could be accommodated. Smela ultimately determined that Dusan's restrictions could not be accommodated in the Guest Room Attendant position. As a result, Belterra's policy mandated that Dusan find a different position where her restrictions could be accommodated.

….

18. On April 26, 2013, Smela, Belterra's Team Member Relations Counselor ("TMR Counsel"), one of Belterra's HR representatives, and Belterra's Housekeeping Supervisor, met with Dusan and with the use of a phone translation service, explained to Dusan that she was responsible for finding and applying for a new position within thirty (30) days. To facilitate her search, Belterra's TMR Counselor gave Dusan a list of open jobs and told her to work with HR if she had any questions. Dusan was also advised that if she did not find a new position within thirty (30) days, her employment with Belterra would be terminated.

19. Of the positions provided to Dusan, Dusan contends that at the time of her discharge, she could perform the following positions, with or without a reasonable accommodation: a) Barista, b) Bartender, c) Concession Worker, d) Beverage Server, e) Cage Cashier, and f) Specialty Room Foodserver. The positions' requirements with respect to Dusan's restrictions and qualifications were:

> a. Barista: the position required the ability to lift or carry items for one (1) to two (2) hours a day. During those one (1) to two (2) hours, the weight of the items carried could range from fifty (50) pounds to ten (10) pounds or less. Generally, the lifting involved with the Barista position involved stocking shelves, including heavy items like chips (30 pounds) and coffee (20-30 pounds). Bending and twisting was required for one (1) to two (2) hours a day for tasks such as bussing tables. Although a front-of-house position, the guest interaction required was limited to taking orders and manning the register.

> ….

20. Of the six (6) positions Dusan contends she could have worked at the time of her discharge, only the Barista position is plausibly a position that Dusan could have completed with or without a reasonable accommodation. Dusan did not have a liquor license in 2013, and accordingly, she was not qualified for the Bartender or Specialty Room Foodserver positions. As Dr. Nunnelley testified, Dusan could not have performed the Concession Worker position in 2013 because she would not have been able to scoop ice cream, which was the core function of the position. As a Beverage Server, Dusan would be well outside of her limited bending instruction, and her limited English would disqualify her from being able to effectively handle guest complaints.

21. However, Dusan could perform the essential functions of the Barista position that were affected by her qualifications (guest communications, stocking shelves, and bussing tables) with or without an accommodation. The Barista position involved a more limited, vocation-specific and conversational vocabulary that would need to be learned on the job by any new employee, and Dusan could have been accommodated by having assistance with stocking the shelves with respect to the two items (chips and coffee) weighing over ten (10) pounds. Bussing tables falls within her restriction of limited bending, and although Dr. Nunnelley expressed concern about Dusan's ability to bus tables, he also concluded that the extent of Dusan's limitations might have best been determined based on a limited "…trial period to see what she could and couldn't do."

….

23. Although Smela and Belterra's TMR Counselor characterized the job search process as a collaborative search effort between HR and Dusan, Belterra's April 26, 2013 letter, Belterra's May 30, 2013 letter, Dusan's understanding, Smela's notes, and Belterra's own actions establish that Belterra placed the burden squarely on Dusan to find a new position. The sole assistance Belterra provided in the job search effort was a two-page list of positions open on April 26, 2013, without job descriptions, and a vague invitation to reach out for assistance. The totality of the evidence presented demonstrates that Belterra's HR department did not actively look for positions that Dusan could have completed within her restrictions during the thirty (30) day period and did not reach out to Dusan outside of the April 26, 2013 meeting. Furthermore, although it was a possibility, Belterra did not extend Dusan's thirty (30) days for a reasonable period of time in the event that additional, more compatible positions would become available.

24. During the thirty (30) day job search period, Dusan did not apply for any positions, and she stopped attending work.

> Although Dusan and Belterra disagree as to whether Dusan left voice messages for Belterra's employees that were unreturned and as to whether Dusan immediately indicated her interest in a number of positions during the April 26, 2013 meeting, the ultimate result of Dusan's attempted communications was that Dusan did not successfully communicate to Belterra that she intended to apply for any position with Belterra. As a result, Dusan's employment was terminated on May 29, 2013.

Appealed Order at 3-11 (footnotes and citations to administrative record omitted).

[4] The ALJ concluded that Dusan failed to prove that Belterra discriminated against her based on national origin and dismissed that claim. As for Dusan's disability discrimination claim, the ALJ concluded that she had a disability "because she could not perform manual labor, engage in extensive bending, and lift items that weighed over ten (10) pounds"; that Belterra was aware of the disability; and that Dusan requested a reasonable accommodation for her disability by providing her physician's restrictions to Belterra. *Id*. at 17. The ALJ noted that "[o]nce an employee makes a reasonable accommodation request, the employer and the employee enter [an] interactive process, during which they engage in a conversational back and forth designed to identify possible accommodations." *Id*. (citing *Knox Cty. Ass'n for Retarded Citizens*, 100 N.E.3d 291, 307 (Ind. Ct. App. 2018), *aff'd on reh'g*, 107 N.E.3d 1111). The ALJ further noted that one option for an accommodation is reassignment to a vacant position for which the employee is qualified. The ALJ then concluded as follows:

33.  Belterra, at least on a surface level, attempted to provide reassignment as an accommodation to Dusan for her permanent work restrictions.  However, Belterra's attempted accommodation was really no accommodation at all.  Belterra provided Dusan thirty (30) days *to apply* for a new position.  The full measure of Belterra's assistance was a two-page list of positions open on April 26, 2013, without job descriptions or any assessment by Belterra of Dusan's ability to perform the essential functions of those positions.  Instead, Belterra placed the burden squarely and solely on Dusan to apply for positions based on Dusan's own understanding of her possible qualifications and limited Belterra's duty to assess Dusan's qualifications and restrictions to the typical and competitive application process.

34.  Belterra points to Dusan's relatively passive response to Belterra's directive to undercut Belterra's own passive attempt to accommodate Dusan.  However, "[i]t is not an employee's responsibility … to repeatedly prod a reticent employer." *EEOC v. Sears, Rosebuck* [sic] *& Co.*, 417 F.3d 789, 808 (7th [Cir.] 2005).[3]  Regardless of Dusan's failure to more actively engage in a job search, the interactive process ultimately broke down because Belterra's thirty (30) day application period and vague invitation to provide assistance offered Dusan nothing past what Dusan could have achieved on her own at any time by simply applying for new jobs with Belterra or any new employer.  After all, Belterra had Dusan's work restrictions and her general qualifications, and Belterra has not contended that Dusan would have provided missing, vital information (outside of her personal preference which Belterra was not required to consider) through the application process.  Belterra effectively ended the interactive

---

[3] As noted elsewhere in the order, "Indiana Courts look to federal law and precedent for guidance when interpreting the ICRL [Indiana Civil Rights Law]."  Appealed Order at 13 (citing *Filter Specialists v. Brooks*, 906 N.E.2d 835, 838 (Ind. 2009)).  The federal materials cited herein relate to the Americans with Disabilities Act (ADA), enacted in 1990.  Indiana enacted statutes addressing employment discrimination against disabled people in 1992.

dialogue on April 26, 2013 when Belterra communicated to Dusan that she would not be accommodated through job restructuring or through genuine reassignment.

35. If an employer fails to engage in the interactive process, the employer can still defeat an employee's failure to accommodate claim if the employee could not be accommodated. [*Knox Cty.*, 100 N.E.3d at 308]; *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000).

36. Importantly, when considering cases where the interactive process has failed, courts have imposed a burden shifting test. If an employee proves that the employee was not accommodated and that the employer failed to participate in the interactive process, then the burden of production shifts to the employer to demonstrate that no reasonable accommodation existed. [*Knox Cty.*, 100 N.E.3d at 308]; *Mays v. Principi*, 301 F.3d 866, 870 (7th Cir. 2002), *abrogated by E.E.O.C. v. United Airlines, Inc.*, 693 F.3d 760 (7th Cir. 2012) (on other grounds) ("… the only consequence of the employer's failing to consult with the employee concerning a possible accommodation of the employee's disability is to shift the burden of production concerning the availability of a reasonable accommodation from the employee to the employer.")[, *cert. denied* (2013)]; *Hansen*, 233 F.3d at 523. Ultimately, the burden of persuasion always rests on the employee, who must demonstrate that the employer's statements concerning the inability to accommodate are false and that the employee could have been accommodated. *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005).

37. Dusan was not qualified for most of Belterra's positions available on April 26, 2013; however, Belterra has not provided credible evidence as to why Dusan could not have been accommodated through reassignment to the position of Barista with additional accommodations like minor job restructuring, the help of co-workers, or the use of occupational tools for her physician-imposed restrictions. Similarly, Belterra did not

explain why, if Belterra believed that Dusan could not perform any of the jobs open on April 26, 2013, Belterra did not extend Dusan's thirty (30) day period for a reasonable period of time to allow for the possibility of future, compatible vacancies.

38. Belterra has not designated evidence that a seniority policy or collective bargaining policy made reassignment unreasonable or created undue hardship for Belterra.

39. Dusan could have been accommodated without imposing undue hardship on Belterra through reassignment to the Barista position, with additional accommodations made to limit her bending and lifting, or through a reasonable extension of her job search period to allow for possible future vacancies. Accordingly, Belterra discriminated against Dusan on the basis of disability by failing to provide her with a necessary reasonable accommodation.

Appealed Order at 20-22 (footnotes omitted). The ALJ awarded Dusan $76,583.41 in back pay and denied her request for front pay. The ALJ also ordered certain Belterra employees to attend disability discrimination training and directed Belterra to submit for the Commission's approval an internal policy for providing reasonable accommodations to employees.

[5] In October 2019, after a hearing on the parties' objections to the ALJ's order, the Commission affirmed and adopted the order as its final order. Belterra now appeals the ruling in favor of Dusan on her disability discrimination claim, and Dusan cross-appeals the amount of her award for back pay and the denial of her claim for front pay.

# Discussion and Decision

[6] "In reviewing an administrative decision, we must determine 'whether substantial evidence, together with any reasonable inferences that flow from such evidence, support the [agency's] findings and conclusions.'" *Zeller Elevator Co. v. Slygh*, 796 N.E.2d 1198, 1206 (Ind. Ct. App. 2003) (alteration in *Zeller*) (quoting *Walker v. Muscatatuck State Dev. Ctr.*, 694 N.E.2d 258, 266 (Ind. 1998)), *trans. denied* (2004). In doing so, we neither reweigh the evidence nor judge the credibility of witnesses, and we consider only the evidence most favorable to the Commission's findings. *Id.* We do not try the facts de novo, but an agency's legal conclusions are ordinarily reviewed de novo. *Moriarity v. Ind. Dep't of Nat. Res.*, 113 N.E.3d 614, 619 (Ind. 2019). Law is the province of the judiciary, and our constitutional system empowers courts to draw legal conclusions. *Zeller*, 796 N.E.2d at 1206. Therefore, we review conclusions of law to determine whether the Commission correctly interpreted and applied the law. *Id.*

[7] An agency's "conclusions as to ultimate facts involve an inference or deduction based on the findings of basic fact." *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d 1314, 1317 (Ind. 1998). "These questions of ultimate fact are sometimes described as 'questions of law.'" *Id.* (quoting *Hehr v. Review Bd. of Ind. Empl. Sec. Div.*, 534 N.E.2d 1122, 1124 (Ind. Ct. App. 1989)). "They are, however, more appropriately characterized as mixed questions of law and fact." *Id.* at 1317-18. As such, they are typically reviewed to ensure that the agency's inference is reasonable or reasonable in light of the agency's findings. *Id.* at 1318. "The term 'reasonableness' is conveniently

imprecise." *Id.* Some questions of ultimate fact are within the agency's special competence. *Id.* If so, it is appropriate for a court to accord greater deference to the reasonableness of the agency's conclusion. *Id.* "In evaluating this conclusion, if no proposition of law is contravened or ignored by the agency conclusions, the 'reasonable' inference standard gives deference to the agency determination." *Id.* Not all ultimate facts are within the agency's area of expertise, however. *Id.*

> As to these, the reviewing court is more likely to exercise its own judgment. In either case the court examines the logic of the inference drawn and imposes any rules of law that may drive the result. That inference still requires reversal if the underlying facts are not supported by substantial evidence or the logic of the inference is faulty, even where the agency acts within its expertise, or if the agency proceeds under an incorrect view of the law.

*Id.*

[8] Indiana Code Section 22-9-5-19 provides that an employer "may not discriminate against a qualified individual with a disability because of the disability of that individual in regard to" such things as the hiring or discharge of employees, job training, and "[o]ther terms, conditions, and privileges of employment." "Discriminate" includes "[n]ot making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee unless the [employer] can demonstrate that the accommodation would impose an undue

hardship on the operation of the business of the [employer]."[4] Ind. Code § 22-9-5-7. A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires." Ind. Code § 22-9-5-16. A "disability" is defined in pertinent part as "a physical or mental impairment that substantially limits at least one (1) of the major life activities of the individual[.]" Ind. Code § 22-9-5-6(a).[5] And "reasonable accommodation" includes "[j]ob restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, training materials or policies, the provision of qualified readers

---

[4] Indiana Code Section 22-9-5-18 defines "undue hardship" as "an action requiring significant difficulty or expense when considered in light of" the following factors:

(1) The nature and cost of the accommodation needed under this chapter.

(2) The:

(A) overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation;

(B) number of persons employed at the facility or facilities;

(C) effect on expenses and resources; or

(D) impact otherwise of the accommodation upon the operation of the facility or facilities.

(3) The overall financial resources of the covered entity [e.g., the employer], the overall size of the business of a covered entity with respect to the number of employees, and the number, type, and location of facilities.

(4) The type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of the entity, and the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

[5] "'Major life activity' means a function, such as the following: (1) Caring for oneself. (2) Performing a manual task. (3) Walking. (4) Seeing. (5) Hearing. (6) Speaking. (7) Breathing. (8) Learning. (9) Working." 910 Ind. Admin. Code 3-2-9.

or interpreters, and other similar accommodations for individuals with disabilities." Ind. Code § 22-9-5-17.

[9] To prevail on a failure-to-accommodate disability discrimination claim, a plaintiff must establish that she was a qualified individual with a disability, that the employer was aware of her disability, and that the employer failed to reasonably accommodate her disability. *Sansone v. Brennan*, 917 F.3d 975, 979 (7th Cir. 2019). Belterra observes that the parties do not dispute that Dusan had a disability, that Belterra was aware of it, and that Dusan "was no longer a 'qualified individual' for her previous position of Guest Room Attendant because she could not perform its essential functions with or without an accommodation." Appellant's Br. at 29. Belterra posits, and we agree, that "the dispute focuses on the third element of whether Belterra failed to reasonably accommodate Dusan once she received permanent work restrictions in April 2013,[6] including whether she was 'qualified' for Belterra's open positions at the time of her discharge." *Id*.

[10] "The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment, including the existence of a vacant position for which she is qualified." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92,

---

[6] As indicated in the Commission's order, Dusan reached MMI and received permanent work restrictions in November 2012. She then participated in physical therapy until April 2013, at which time her occupational physician reaffirmed her MMI status and permanent restrictions in a letter to Smela. Ex. Vol. 3 at 154 (Belterra's Ex. 8).

97 (2nd Cir. 2009). "By contrast, with regard to the reasonableness of a proposed accommodation, a plaintiff bears only a light burden of production that is satisfied if the costs of the accommodation do not on their face obviously exceed the benefits. The burden of persuasion falls on the defendant employer." *Id*. at n.3. To be qualified, the employee must satisfy the legitimate prerequisites for the vacant position and "be able to perform the essential functions of that position with or without reasonable accommodations." *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 678 (7th Cir. 1998). "An employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee. Nor is there any duty to reassign an employee to a permanent light duty position." *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Jud. Cirs.*, 601 F.3d 674, 680 (7th Cir. 2010) (citation omitted). A "plaintiff does not satisfy her burden to identify a potential accommodation merely by reciting the formula that her employer could have reassigned her. Instead, she must demonstrate the existence, at or around the time when accommodation was sought, of an existing vacant position to which she could have been reassigned." *McBride*, 583 F.3d at 97-98; *see also Novak v. Nicholson*, 231 F. App'x 489, 492 (7th Cir. 2007) ("While Novak complains that without the VA's help he was unable to find a vacant position, it was Novak's responsibility in discovery to obtain the necessary evidence to support his failure to accommodate case, for instance, by requesting copies of vacancy or placement announcements.").

"Identifying reasonable accommodations for a disabled employee requires both employer and employee to engage in a flexible, interactive process." *Knox Cty.*, 100 N.E.3d at 306 (quoting *Brown v. Milwaukee Bd. of Sch. Dirs.*, 855 F.3d 818, 821 (7th Cir. 2017); *see also* 910 Ind. Admin. Code 3-2-14 ("To determine the appropriate reasonable accommodation, it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."). Only if an employee satisfies her burden to show that a vacant position exists for which she was qualified may a court then "consider whether 'failure to provide that accommodation was due to a breakdown in the interactive process.'" *Jackson*, 414 F.3d at 806 (quoting *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001)). There is no separate cause of action for a failure of the interactive process, and because the process is not an end in itself, it is not sufficient for an employee to show that an employer failed to engage in the process or caused the process to break down. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014); *see also Mays*, 301 F.3d at 871 ("[W]hen no reasonable accommodation is possible the failure to jaw about accommodation is harmless.").

In this case, the Commission found as follows: (1) that Belterra caused the interactive process to break down; and (2) that Belterra could have accommodated Dusan's disability by reassigning her to a barista position or by

extending the thirty-day job-search window by a "reasonable period of time[.]" Appealed Order at 22. Belterra challenges both findings, but we need not address the first because we agree with Belterra that Dusan failed to carry her burden of demonstrating the existence of a reasonable accommodation for her disability.

[13] At the outset, Belterra contends that the Commission "incorrectly applied the burden of proof" by "suggest[ing] possible accommodations—which Dusan herself never asserted—for the first time in its ALJ's Order, and then [holding] Belterra responsible for failing to disprove the reasonableness of those accommodations." Appellant's Br. at 34 (citing Commission's conclusion 37). We agree. Belterra suggests—correctly, in our view—that the burden-shifting test in conclusion 36 of the Commission's order appears to be based on a "truncated and incomplete" quotation from *Hansen*, 233 F.3d 521, in *Knox County*, 100 N.E.3d 291. Reply Br. at 18. As the Seventh Circuit Court of Appeals thoroughly explained in *Mays*,

> We think the best understanding of the brief passage in *Hansen* concerning burden shifting is that the (only) consequence of the employer's failing to consult with the employee concerning a possible accommodation of the employee's disability is to shift the burden of production concerning the availability of a reasonable accommodation from the employee to the employer. The plaintiff cannot seek a judicial remedy for the employer's failure to accommodate her disability without showing that a reasonable accommodation existed. But if it existed yet she failed to obtain it because the employer had not consulted her in order that "together they can identify the employee's needs and discuss accommodation options," the fault in the failure to make

the accommodation available would be the employer's and he would lose. *Emerson v. Northern States Power Co.*, 256 F.3d 506, 515 (7th Cir. 2001); see also *Ozlowski*[, 237 F.3d at 840]. The purpose of the consultative process is to find a reasonable accommodation for the particular disabled employee, and if she proves that such an accommodation existed, that nevertheless she did not receive it, and that there was no consultative process, suspicion arises that the reason her disability was not accommodated was not that she turned down a reasonable accommodation but that the employer failed to explain her options to her and thus did not make it "available" to her in a practical sense. The burden shifts to the employer to produce some evidence that even if he failed to consult or "interact" with her, soliciting her suggestions for a reasonable accommodation, etc., he offered her such an accommodation with sufficient clarity to make the accommodation available to her in a practical sense, so that her rejecting it was her own fault.

301 F.3d at 870. Here, Dusan failed to meet the threshold burden of proving the *existence* of a reasonable accommodation. Thus, the burden of production never shifted to Belterra, and it was not obligated to introduce evidence regarding the *availability* of that accommodation.

[14] Belterra further contends that the Commission erred in finding that Dusan could perform the essential functions of the barista position without an accommodation. We agree. The Commission found that Dusan had permanent restrictions of limited bending and a lifting limit of ten pounds, and it further found that the barista position involved stocking shelves by lifting thirty-pound containers of chips and twenty- to thirty-pound containers of coffee. Clearly, Dusan could not perform this essential function without an

accommodation.[7] Also, contrary to the Commission's findings, Dr. Nunnelley unequivocally stated that Dusan could not perform the essential function of busing tables. Ex. Vol. 3 at 12 (Dusan's Ex. 25) (Nunnelley depo. at 33).[8]

[15] Dusan failed to propose any accommodations for the barista position,[9] and those improperly proposed by the Commission are unreasonable as a matter of law. As for the Commission's suggestion that Dusan could have performed the essential functions of the barista position with "the help of co-workers," Appealed Order at 22, we note that an employee's request to have another person perform an essential function of her job is generally deemed unreasonable. *See Peters v. City of Mauston*, 311 F.3d 835, 845-46 (7th Cir. 2002) (finding construction worker's request "that someone else do the heaviest lifting for him if he could not handle it" was unreasonable); *see also Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 484 (7th Cir. 2002) ("Under the ADA, an

---

[7] Questions of accommodations aside, it is doubtful whether Dusan was otherwise qualified for the barista position. The Commission's finding that Dusan's limited English-speaking skills were sufficient for that position in April 2013 is highly dubious at best, given that she still primarily speaks Cantonese and that the Commission also found she did not have sufficient English skills to effectively handle guest complaints as a beverage server. *See* Ex. Vol. 2 at 167, 168 (Dusan's Ex. 22) (job description listing as essential function of barista position the "[a]bility to communicate effectively with customers, as well as all levels of employees[,]" and indicating that "[t]alking" is required for over seven hours per day).

[8] Dr. Nunnelley's comment regarding a "trial period" was in response to a question about pouring coffee into a cup. Ex. Vol. 3 at 12 (Nunnelley depo. at 32-33). We note that in referring to exhibits, both parties fail to cite to the specific exhibit volume and page number as required by Indiana Appellate Rule 22(C).

[9] Dusan asserts that "[t]he reasonable accommodation request was for [her] to maintain employment, which … is an acceptable form of an accommodation." Appellee's Br. at 32. Belterra correctly observes that "'continued employment' is the *result* of a reasonable accommodation (where one is available), not the accommodation itself[,]" and that "Dusan seems to conflate an employee's duty to *request* an accommodation and trigger the interactive process with her burden *at trial* to prove she was 'qualified,' i.e., that she could perform all the essential functions of the desired job with or without reasonable accommodations." Reply Br. at 15.

employer is not required to modify, reduce, or reallocate the essential functions of a job to accommodate an employee."). Dusan presented no evidence, and the Commission made no finding, that it was "the normal course" for baristas "to substitute and reassign tasks among themselves according to individual abilities, preferences, and limitations[,]" which might have supported a determination that such an accommodation was reasonable. *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 200 (7th Cir. 2011). The Commission's suggested "trial period" for busing tables—which is based on a misreading of Dr. Nunnelley's deposition testimony—is also unreasonable. Appealed Order at 9; *see Peters*, 311 F.3d at 846 ("Allowing the employee to return to work to see if he can complete the job is the wrong test as to whether an accommodation is reasonable. The employer is not obligated to allow the employee to try the job out in order to determine whether some yet-to-be requested accommodation may be needed.") (citation omitted).

[16] Moreover, as Belterra notes, Dusan never proposed an extension of her thirty-day job-search period as an accommodation. This, too, was improperly proposed by the Commission, and this, too, would have been unreasonable because Dusan presented no evidence of an imminent job opening for which

she would have been qualified.[10]  *See* Ind. Code § 22-9-5-17 (listing "reassignment to a *vacant* position" as a reasonable accommodation) (emphasis added); 29 C.F.R. pt. 1630 App'x ("Employers should reassign the individual to an equivalent position … if the individual is qualified, and if the position is vacant *within a reasonable amount of time*.  A 'reasonable amount of time' should be determined in light of the totality of the circumstances.  As an example, suppose there is no vacant position available at the time that an individual with a disability requests reassignment as a reasonable accommodation.  *The employer, however, knows that an equivalent position for which the individual is qualified, will become vacant next week.*  Under these circumstances, the employer should reassign the individual to the position when it becomes available.") (emphases added); *McBride*, 583 F.3d at 97-98 (stating that an employee "must demonstrate the existence, *at or around the time* when accommodation was sought, of an existing vacant position to which she could have been reassigned.") (emphasis added); *Monette v. Elec. Data Systs. Corp.*, 90 F.3d 1173, 1187 (6th Cir. 1996) ("While it is true that employers may be required, as a reasonable accommodation, to transfer a disabled employee to a vacant position for which he or she is qualified, employers are under no duty to keep employees on unpaid leave indefinitely until such position opens up."),

---

[10] The Commission also noted in passing that "a part-time laundry room position was available" and that Belterra "did not discuss offering to accommodate [Dusan] by allowing her to continue her same transitional tasks in the laundry room as a restructured job position on the laundry room team."  Appealed Order at 20 n.25.  Belterra observes that Dusan "did not identify the laundry room position as a possible position in her pre-hearing discovery responses" and did not "assert (or offer any evidence) that she was qualified for this position during the hearing."  Appellant's Br. at 37.

*abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012).

[17] In sum, we conclude that the Commission erred in concluding that Dusan carried her burden to prove that Belterra discriminated against her by failing to provide her with a reasonable accommodation for her disability. Therefore, we reverse the Commission's ruling in favor of Dusan, and we need not address Dusan's cross-appeal regarding damages.

[18] Reversed.

Robb, J., and Brown, J., concur.